326 P.2d 395

STATE of Utah in the Interest of K——— B———, alleged dependent and neglected child.

No. 8722.

Supreme Court of Utah.

June 5, 1958.

Robert L. Schmid, Salt Lake City, for appellant.

E. R. Callister, Jr., Atty. Gen., McBroom & Hanni, Salt Lake City, for respondent.

CROCKETT, Justice.

This is an appeal from an order of the juvenile court of Salt Lake County depriving appellant, the father of the subject child, a boy two and one-half years of age, of all rights in the child upon the ground that he was a neglected child under Section 55–10–6, U.C.A.1953, and directing the Childrens Service Society, an authorized child placement agency, to arrange for the completion of adoption of the child by the foster parents with whom the child has been living.

Before proceeding to discuss the question as to whether the facts shown justify the

order made, we first consider a problem fundamental to the entire proceeding: Appellant's charge that the juvenile court has no authority under any circumstances to make an order permanently depriving a parent of his child.

The various sections of Chapter 10, Title 55, U.C.A.1953 relating to the juvenile court repose in it responsibility for dealing with children found in such conditions of abuse or neglect as to warrant the intervention of public authority in their interest. The objective is to safeguard the welfare of such children so that they may live happy, well-adjusted lives and thereby realize, to the highest possible degree, their potential for becoming useful and worthwhile members of society. And the court is empowered to make such orders as are necessary to carry out that purpose:

55–10–5, " * * * the juvenile court shall have exclusive original jurisdiction in all cases relating to the neglect * * * of children * * *.

"(1) * * * [if] a child [is] neglected, * * * [the court may] proceed to inquire into * * * the fitness of such parents to continue in the custody * * * of such child."

55–10–30, " * * * if the juvenile is adjudged * * * neglected * * * the court * * * may * * * decree * * *

\* \* \* \* \* \*

"(4) That the child be placed under such guardianship or custody as may be warranted * * * for the best interests of the child; * * *

"(5) That the child be disposed of in any other way * * * that may * * * under all circumstances be for the best interests of the child, to * * be saved to useful citizenship."

55–10–32, "No child * * * shall be taken from the custody of its parents * * * unless the court shall find * * * that such parent * * * has knowingly failed and neglected to provide for such child the proper maintenance, care, training * * * or unless the court shall find from all the circumstances * * * that public welfare or the welfare of a child requires that his custody be taken from its parents * * *."

55–10–40 provides for the placement of a neglected child with "any children's aid society or institution * * * subject to the continuing authority and jurisdiction of the court."

55–10–41 provides for return of custody to parents if and when they have reformed or conditions have changed to warrant doing so.

55–10–43 directs the society to place such children in suitable homes and authorizes it to carry forward adoption into such families where that is deemed proper.

It seems hardly open to question that circumstances may exist which would require public authority to intervene in the interest of children. It is regrettable, but nevertheless true, that sometimes parents are so indifferent to their responsibilities, or are of such low moral standards, or mayhap have psychopathic or even sadistic tendencies, so that it would be unconscionable to leave children with them. In civilized societies since antiquity it has been realized that the welfare, training and education of children are of such vital importance as to be a matter of public concern. One of the basic tenets of our system of law and justice is that it attempts to accord to all individuals protection in their persons and property, and this is true, a fortiori, of children. The juvenile court is the agency of our government which is given the primary responsibility for them, and the intent of the statutes hereinabove set out endow the court with authority to perform its function in that regard.

█ The broad power of the juvenile court in regard to children found to be neglected is indicated in Deveraux v. Brown,[1] wherein this court spoke through Justice Wade: ´

"The [Juvenile] court is given broad * * * discretion in determining the custody of the child and its orders may range from mere temporary custody pending an investigation * * * to an order intended to permanently deprive the parent of the custody of his child by committing the child to * * a child placement society to be placed * * * for adoption without the consent of the parents."

█ It seems plain that the intent and purpose to be divined from the statutes above quoted is that the juvenile court has authority to permanently deprive parents of the custody of the children when circumstances make such action necessary for their protection and welfare. In so concluding we are aware that such power is indeed awesome in the effect it may have upon the lives of the persons involved. It should be administered with sound discretion and with due regard for the presumption that the natural parent is the proper custodian of his child, and that it is the policy of courts to be reluctant to deprive parents of their children.[2]

Pursuant to its authority in the premises, and after due notice and hearing, at which appellant appeared in person and by counsel, the juvenile court made its order depriving appellant of custody of the child and committing him to the care of the Childrens Service Society. It also author-

1. 2 Utah 2d 334, 273 P.2d 185, 186; see also Jacob v. State By and Through Public Welfare Comm., 7 Utah 2d 304, 323 P.2d 720.

2. In re Adoption of D——, 122 Utah 525, 252 P.2d 223.

ized the Society to "arrange for the completion of the adoption by the foster parents with whom the child has lived and become attached"; and further ordered that the matter be continued for a period of six months. The latter, apparently pending the completion of adoption proceedings in the district court.

■ In approaching appellant's contention that the evidence does not justify the order made, it is well to have in mind the basic rules applicable to this review. The statute provides that appeals from the juvenile court shall be, "in the same manner * * * as * * * appeals from judgments * * * of the district court * *."[3] Hearings in the juvenile court involving questions as to the custody of children are equitable. Due to the extreme concern of courts for the welfare of children, proceedings in their interest are sometimes stated to be equitable in the highest degree, because the most careful consideration will be given such matters.[4] In equity proceedings we are charged with the responsibility of reviewing the evidence;[5] and it is the established rule that we will not disturb the findings and determination made unless they are clearly against the weight of the evidence, or the court has abused its discretion.[6]

In view of the unsavory nature of the evidence in this case, which, unhappily, devolves around an entirely innocent little boy, we have no relish for the necessity, provoked by appellant's contention, of reciting facts which refute it and justify the order made, but in order to avoid a mere ipse dixit, feel obliged to do so briefly.

Appellant, a man in his thirties and S——, the mother of the child, in her early twenties, both of whom had attended college some and had a mutual interest, the study of art, began living together without benefit of clergy. Although appellant had previously been married, he professed not to believe in formal marriage on the ground that people should be free to live in promiscuity if they desired. This meretricious relationship commenced in Utah and continued as they moved about in several of the western states, finally returning here. Appellant apparently had as little use for the formalities of working and earning a living as he did for abiding by the rules of society. He worked only sporadically, enough to get by, and shunned the responsibilities of establishing a home. He suggested to S—— that she become a prostitute and that he would "find the business." Further evidence was that he indulged in unnatural sex practices, both upon S——

3. Sec. 55-10-34 U.C.A.1953; 31 Am.Jur. 808; In re Cannon, 27 Cal.App. 549, 150 P. 794.
4. See discussion, In re Adoption of D——, footnote 2, supra; Walton v. Coffman,

110 Utah 1, 169 P.2d 97 and cases cited therein.
5. Utah Const. Art. VIII, Sec. 9.
6. Morley v. Willden, 120 Utah 423, 235 P.2d 500.

and others, including children. Upon their return to Utah they went to live in comparative isolation at one of the houses at a duck club near the shores of Great Salt Lake, where they acted as caretakers for which appellant received between $800 and $1,200 per year.

Appellant's general disdain for the mores of society extended to medical care. During the peregrinations of the parties S—— became pregnant and had a miscarriage, in connection with which he refused to procure medical attention. He likewise refused such care during her pregnancy with this child, and also refused to get silver nitrate to use on the baby's eyes at birth. His assigned reason for such obstinancies was that it was expensive and unnecessary, and that animals required no such help or protection; and that such solicitude had resulted in the preservation of the weak and unfit at the expense of the strong. S—— testified that she had not been able to persuade appellant to give her money to buy clothing for the expected child and that she had to pick ducks for small fees and secretly send the money to town to get some baby clothes. Under those circumstances she was forced to go through the experience of giving birth to the child out at the duck club, many miles from town in the middle of the winter, without anyone in attendance except appellant, further details of which can well be spared the light of print.

The evidence further showed that in October, 1955, when the baby was 10 months old, appellant told one J—— S—— that his desire was to "dump" S—— and the child so that he would be rid of them. J—— S—— later took S—— and the child from the duck club, with the cooperation of appellant, who gave them his suitcase to pack their belongings in, and drove them to the bus station. He knew of their whereabouts for at least four months, during which time he manifested no concern for S—— or the child. After that time he did write, indicating an interest in S—— and the possibility of having her return to him. But he did not show any particular interest in the child and never made any effort to support him.

The tribulations of S—— in attempting to fend for herself and the child need not be detailed except to say that she had such a difficult time that in February, 1956, she left the child with the Childrens Service Society, maintaining some interest in him for a time with the intention of eventually getting him back. But she finally concluded that it would be impossible for her to care for the child and voluntarily consented that he be placed for adoption.

Meanwhile the court had placed the child in a suitable foster home so that he might have proper care. When S—— released him the court indicated that an adoption could go forward, which, in the case of a child born out of wedlock, may ordinarily

be done upon the consent of the mother.[7] However, upon learning of the facts concerning appellant's living with S—— prior to, and for some time after, the birth of the child, it was deemed advisable to give appellant notice of a hearing with respect to the status of the child. Although he had never theretofore shown any concern, he contested the proceeding and laid claim to the child. It appeared that he had taken up living with another woman and after doing so for a period of four months, they had married. It was represented that his present wife was willing to accept the child.

■ A recital of the above facts seems to constitute practically a self-proving proposition that there was ample evidence to justify the juvenile court in concluding that the welfare of the child required that he be taken permanently from the appellant and that he be placed for adoption.

If the circumstances here disclosed do not constitute sufficient evidence to justify the juvenile court in making the order, then we are made to wonder wherein is its discretion, and under what circumstances could such an order be justified.

This Bohemian attitude toward life wherein people are wont to assume the pose that they do not care about the opinions and customs of society, and that they "do and say as they think," upon analysis, usually resolves down to the fact that they "do and say, but *don't* think." Such a matter might be looked upon with indulgence were it not that everyone's conduct inexorably affects not only himself, but others around him, and in fact, humanity. "No man is an island" is more than a literary phrase.[8] It expresses a vital truth of which the story lying back of this case and the effect upon the child and the other parties involved, not all of which is reflected in this opinion, is a good illustration. Fortunately the child, through the good offices of the juvenile court, has been preserved and found a haven where he is appreciated and loved, a great contrast to his prior circumstances and their potential.

■ The final point for consideration relates to appellant's assignment of error in the admission of evidence with respect to the suitability of the adoptive parents and their home. Strictly speaking, it is not relevant to the issue as to whether appellant should be permanently deprived of his child. It is recognized that the proceeding was not one for adoption; nor was it an adversary proceeding in the nature of a contest as to whether appellant or the

---

7. 78–30–4, U.C.A.1953: "A legitimate child cannot be adopted without the consent of its parents * * * nor an illegitimate child without the consent of its mother * * *."

8. The Bell, Devotions by John Donne.

foster parents were better suited to take care of the child. It was a proceeding in the interest of the child. However, in view of the responsibility of the Society "to use special diligence in providing suitable homes for such children as may in this way be committed to its care,"[9] it was not amiss for the court to receive evidence at least to the extent that the child was being properly cared for, and this was not prejudicial to the appellant.

We observe that in view of the delicacy involved in the transition of a child into an adoptive home, and the desirability of protecting persons willing to afford homes to children left to that necessity, it may be the wiser course not to introduce evidence concerning the proposed adoptive home in a proceeding such as the instant one, except to show generally that the child is receiving proper care. It is important that no foundation be laid for conflict between the relinquishing and the adoptive parents, or possible harassment of the latter. The court seemed aware of this and we do not see that the manner in which the hearing was handled was prejudicial to appellant.

Affirmed. No costs awarded.

McDONOUGH, C. J., and WADE, WORTHEN and HENRIOD, JJ., concur.

9. Sec. 55-10-40, U.C.A.1953.