**State of Utah, in the Interest of Ricky WINGER.**

**Appeal of Geraldine M. DAVIS.**

**No. 14368.**

Supreme Court of Utah.

Dec. 17, 1976.

Dale R. Kent, Salt Lake City, for appellant Davis.

Vernon B. Romney, Atty. Gen., R. Paul Van Dam, Salt Lake County Atty., for State.

David S. Dolowitz, of Parsons, Behle & Latimer, Salt Lake City, for Ricky Winger.

MAUGHAN, Justice:

The mother of Ricky Winger appeals from an order of the Juvenile Court terminating all her parental rights, on the ground she is incompetent by reason of a condition seriously detrimental to the child, Section 55–10–109(1)(a), U.C.A.1953, as enacted 1965. We reverse, and remand for further proceedings consonant with this opinion.

The child, a little boy, was born December 31, 1973. He lived with his parents until March 8, 1974, when the police removed him while his parents were engaged in a domestic altercation. The parents were temporarily deprived of custody on the grounds: (1) They were emotionally and intellectually unable to care adequately for the child. They had a low frustration tolerance, and the mother was unable to channel her anger. (2) The parents were unable to provide a suitable environment in that they were constantly fighting between themselves, and the child *could be* in physical danger. (3) Although the mother honestly wanted and cared for the child, there was a real question as to her ability to care for it.

Subsequently, the parents petitioned for return of the custody of the child. An amended petition was filed by a case worker alleging the parents were unfit or incompetent; by reason of conduct, or a condition seriously detrimental to the child. The specific allegation was the parents were mentally and emotionally unable to provide the child with proper care and stability. Upon hearing, the Juvenile Court ordered all parental rights terminated. Prior to this hearing the natural parents were divorced, the mother remarried; and she alone appeals.

The court found the mother incompetent by reason of a condition, viz, she was mentally and emotionally unable to provide the child with proper care and stability; she was a mental defective; emotionally unstable, in that she had a lack of control, low frustration tolerance and was hostile; she was immature, self-centered, dependent, and lacked social skills; she had extremely limited parental skills and her ability to change was extremely limited. The court found the child was microcephalic (small-brained), hypotonic (lack of muscle tone), mentally retarded, and seriously delayed in his development. The court found Ricky Winger a frustrating child, and, as a result of these conditions, he had special needs the parents were unable to meet. These conditions, it was found, were seriously detrimental to the child.

In its memorandum decision the court stressed there was no serious claim the child had ever been abused or neglected. It further explained:

The Court is not unmindful of the feelings of the parents. I'm certain they care for Ricky. There is no fault on either parent. The Court believes, and states, that to deprive these parents of this child is a cruel act. Yet here is a condition that is impossible. Both parents are mentally retarded and the mother is emotionally unbalanced. The child has physical and mental disabilities which require not just ordinary care but unusual care. In looking to the totality of circumstances the Court has concluded that the parents are incompetent and that this condition is seriously detrimental to the child. The Court directs that Findings and Order consistent with this Memorandum be filed.

On appeal, the mother contends the Juvenile Court erred; because the decision was based only on the fear she *might*, in the future, harm the child, or be unable to care for him properly. Also, there was no evidence she had harmed the child, or had been unable to care properly for him. The mother asserts the termination order constituted an abuse of discretion, and, she challenges the sufficiency of the evidence to support the order. We think her position well taken:

To sustain an order terminating the parent-child relationship, the court must be convinced by a preponderance of the evidence that the conduct or condition is

seriously detrimental in its effect on the child.[1]

Termination of parental rights is a drastic remedy. It should be resorted to only in extreme cases. Such cases occur when it is manifest the home itself cannot, or will not, correct the evils which exist. Because of the gravity of permanent severance of all family ties it is deemed both socially and economically undesirable, unless it is the only alternative consistent with the welfare of the child or the public interest.[2] There is a presumption of great strength, it is in the best interests of a child to be reared by its natural parents. This presumption is only overcome when the trier of facts is convinced by a preponderance of the evidence the welfare of the child requires termination. Since this presumption is based on logic, (for experience indicates generally parents have more love, devotion, and regard for their own children than do others); it has evidentiary value; which must be considered by the trier of fact, in determining the question of termination.[3]

55–10–109, U.C.A.1953, as enacted 1965, provides:

(1) The court may decree a termination of all parental rights with respect to one or both parents if the court finds:

(a) That the parent or parents are unfit or incompetent by reason of conduct or condition seriously detrimental to the child; . . .

The State argues the assertions of the mother concerning her conduct are irrelevant. This because the statute provides in the disjunctive, for "conduct" or "condition" seriously detrimental to the child, and the mother's rights were terminated based on her "condition" exclusively. However, this does not appear to be the basis of the mother's argument; her assertion is that her conduct clearly and persuasively contra-dicts the findings that her condition has had or will in the future have a seriously detrimental effect on the child. She points out there is not a scintilla of evidence indicating she has harmed or neglected him. Also, she accurately notes the fears expressed about her ability and the welfare of the child are based on speculation not on any events concerning the parent-child relationship. Her conduct, she contends, clearly illustrates her condition has never had a seriously detrimental effect on the child. She points not only to the time when the child resided with her, but to the care she has provided on weekends when she has been granted visitation in her home.

The mother's point is illustrated by such cases as *State v. Blum*.[4] There the mother's rights were terminated by reason of her mental illness. The mother had been in and out of the state mental hospital four times. Her illness was diagnosed as a paranoid schizophrenic, chronic, and the prognosis was that she would never be able to care for her child. Her illness was manifested by behavior which included frequent bizarre hallucinations, long periods of depression during which she was hysterical and cried continuously, refusal to accept responsibility for her own personal care, and rejection of any responsibility for her child. The court found her mental condition was incurable within the foreseeable future, and was seriously detrimental to the child.

The Oregon statute provided in words identical to ours, the rights of parents may be terminated if the court finds the parents: "(a) are unfit by reason of conduct or condition seriously detrimental to the child . . ."[5]

Interpreting this statute the court said:

. . . A court's judgment terminating parental rights under this statute must be supported by a preponderance of the evidence, proving (1) that the parent

1. *In Re State In Interest of Mullen*, 29 Utah 2d 376, 377, 510 P.2d 531 (1973).

2. *State v. Lance*, 23 Utah 2d 407, 464 P.2d 395 (1970); Sec. 55–10–100(18), U.C.A.1953, as amended 1965.

3. *State v. Lance*, Note 2, supra; *State In Re Interest of L. J. J.*, 11 Utah 2d 393, 360 P.2d 486 (1961).

4. 1 Or.App. 409, 463 P.2d 367 (1970).

5. ORS 419.523(2)(a).

is presently unable to supply physical and emotional care for the child (if necessary, with the aid of social agencies available), and (2) that this condition will probably continue for time enough to render improbable integration of the child into a family if the parent's rights are not terminated. . . .[6]

■ In *Blum,* it was stated the statute does not require that the conduct of the parent create the condition rendering the parent unfit. This statement does not negate the mother's claim here, that her conduct is relevant in assessing whether her condition should be deemed unfit or incompetent.

*State in Interest of A*[7] and *State in Interest of Mullen*[8] are two cases which illustrate condition or conduct sufficient to support termination of all parental rights. They are illustrative because of their differences from the current matter.

In the instant case, the Juvenile Court apparently relied on the evidence concerning the mother's mental and emotional condition as found by Dr. Liebroder, a clinical psychologist. From her I.Q. scores, he found her in the defective range at a level of trainable mentally retarded. From the Rorschach Ink Blot Test, he concluded no significant psychotic processes were revealed. He found she did evidence confusion, anxiety, and faulty impulse control. He found her thinking quite concrete, and she seemed prone to leap to faulty conclusions based on primitive reasoning and to see the world in terms of simple generalizations and to be unable to deal with situations by considering a range of alternative behaviors. He further found, from the ink blots, the mother revealed weak capacity for empathy, and he states: "It would be expected that her interests would be self rather than other-centered."

From figure drawings, Dr. Liebroder found a projective analysis of her production indicated low frustration tolerance, expansiveness, and a lack of impulse control.

Additionally, there were indications the mother *might* perceive male figures as potentially hostile and that she might engage in aggressive acting-out.

From a test designated projective questions, he found her responses reflected immaturity, dependency, limited intelligence and faulty emotional controls. He cited as an example her response to a question that if she were an animal what kind would she be? She replied, a kitty. When queried why? She responded that somebody picks you up and pets you.

In a personal interview, the mother expressed bitterness toward her family and stated, "I wasn't smart enough, they thought I was too damn stupid." She further expressed anger over her lack of opportunities for formal learning. She indicated great antagonism toward her former husband, citing his deficiencies, and reported she had initiated a divorce action.

Dr. Liebroder was of the opinion the mother's retardation was only part of the problem, and her low frustration tolerance and lack of impulse control precluded her being able to function as an adequate parent. He recommended permanently depriving her of the child.

Rod Stowe, a supervisor of foster care in the Division of Family Services, found the mother hostile and impulsive, when frustrated. He was of the opinion that this aspect of her behavior placed the child in jeopardy. William Lattier, a caseworker of Division of Family Services found the mother to have a limited attention span, and that she blew up easily. He expressed a fear she might harm the child in one of these outbursts.

The Juvenile Court in its memorandum decision observed that during the hearings, the mother over-reacted to the testimony. The court expressed the view that her talking, crying, laughing, and stalking from the courtroom was inappropriate behavior.

---

6. At p. 371 of 463 P.2d.

7. 30 Utah 2d 131, 514 P.2d 797 (1973).

8. 29 Utah 2d 376, 510 P.2d 531 (1973).

Janice Mahood, visiting homemaker, found the mother to be a very good housekeeper and knowledgeable about food preparation. The mother was cooperative with the Division of Family Services in an attempt to have her child returned by (1) attending weekly counseling sessions; (2) visiting regularly with the child; (3) attending regularly the Parent Training Group at Granite Mental Health.

In her report, Ms. Mahood stated:

The Wingers have visited regularly with Ricky, and we have no reason to believe that he is in physical danger when he is with them. I get the feeling, however, that Geraldine is relieved when it's time for Ricky to return to his foster home, because he cries a lot and is fussy, which is frustrating to her.

She further expressed concern about the parents' instability, in her report, but she questioned whether there were grounds for permanent deprivation. She recommended the child be returned and protective supervision maintained to determine if the parents could give proper parental care and protection.

Kenneth Salzman, Master Social Work, did not see the mother as harmful to the child and expressed the opinion the mother could meet the child's minimum needs, and was developing powers of self-control.

Mr. Salzman's report, which was entered in the evidence described the mother-child relationship as follows:

Although Ricky has only had periodic visits with his mother, it is obvious he knows her and relates well to her. When he is upset she is able to comfort him when others, who are not well acquainted, cannot. Mrs. Winger seems to care for Ricky very much, is quite concerned with his needs, and seems to understand and be able to care for him on her own. While returning Ricky to his mother may be somewhat traumatic, this would be minimal in relation to a possible change of foster homes or permanent deprivation.

In his report, Mr. Salzman stated people having little or no knowledge of mental retardation have possibly mistaken the mother's actions for emotional instability. As a result, skepticism has been expressed as to her mothering ability, and the child has continued to be separated from her. He emphasized she had never been abusive toward the child.

Marshall Perkins, Ph.D., Psychology, did not find the mother dangerous to the child, although she was immature and had some emotional instability. He disagreed with the state's position to terminate parental rights. Dr. Perkins stated that it was imperative that one make allowances for emotional anxiety and stress stemming from a mother-child separation experience. Dr. Perkins tested her for social skills and found a range from child-like to adolescent responses, 10 to 18 year old levels. Many of her responses indicated her preoccupation with regaining the care of her child. The doctor had experience with her in a parent education group. He disagreed with Dr. Liebroder, and found the mother was able to look at alternative situations in emotionally laden areas. This was so, if she were relating to supportive persons with whom she had had some prior exposure. He observed in the parent group, the mother was able to listen to others and to verbalize her own anxieties and fears. She expressed a willingness to accept help and supervision in rearing her child. Dr. Perkins recommended the mother be given an opportunity to rear her child under supervision.

Evelyn Holtz, a nutrition aid, who worked with the mother for 4–6 weeks, found the mother did an adequate job of bathing, dressing, and getting the child to sleep. She expressed the opinion the mother need supervisory help. Ms. Holtz was fearful for the child's safety because of the mother's temper.

Terrell Dougan, a citizen's advocate and president of the Utah Association of Retarded Citizens stated that the mother had a good deal of empathy and was currently more mature and calmer than heretofore.

She expressed the opinion the mother's capacity to mother would grow as the child grows.

Mr. and Mrs. Waldo J. Harris had the mother in their home as a foster child and they had an opportunity to observe her with the baby. They describe her as a tender-hearted mother. They had never observed any harm to the baby. They testified the mother was emotionally stable under normal conditions, although she would become upset under stress. They expressed the opinion she could be a good mother, and was scrupulously clean.

Mr. Davis (the present husband of the natural mother) testified he is now married to the mother. He is a college graduate with a secure, steady employment; and can provide a stable home for the mother and child. He testified the mother had the ability to be a good wife, and learned quickly.

The Juvenile Court made no finding as to the weight of the evidence, viz, that by the *preponderance* of the evidence the condition of the mother had a seriously detrimental effect on the child. The evidence has been reviewed at length to show such a finding could not be sustained.

The evidence is conflicting as to the extent of the effect of her immaturity and instability on the child. The specialized care to which the court makes reference involves exercising the child to develop his muscular control. Although, the mother may lack computational skills, and has a limited fund of general information, the evidence indicated she was a good housekeeper and cooked nutritious meals. One could conclude she would have the ability to learn to exercise the child. Furthermore, the record is not clear as to whether several of the witnesses, who expressed fear the mother might harm the child were those to whom Mr. Salzman referred, when he admonished that one unfamiliar with mental retardation might mistake the mother's actions for emotional instability.

*State v. McMaster,*[9] is here reviewed because of its illustrative analysis of the home "seriously detrimental to the child." A petition to terminate parental rights was filed alleging the mutual instability of the parents; their lack of concern and consistency for anyone else living in the home; and their improper management of the family. The evidence indicated the parents frequently quarreled, the father never held a job for more than a month; he frequently left home with the welfare check and left the family destitute.

The court observed the state of the McMaster family was duplicated in hundreds of thousands of American families— transiency, incapacity, poverty, and instability. The court stated when the legislature used the phrase "seriously detrimental to the child;" it had in mind a more serious and uncommon detriment than that caused by the conduct of parents such as the McMasters.

It explained that parental rights cannot be severed when many thousands of children are being raised under basically the same circumstances.

. . . The legislature had in mind conduct substantially departing from the norm and unfortunately for our children the McMaster's conduct is not such a departure.[10]

In the matter before us, the mother was found to be immature, self-centered, hostile, dependent; a lack of control, and low frustration tolerance, and it was expressed she *might* harm the child. She had the opportunity to do so, on numerous weekend visits. It is significant the Juvenile Court noted the child was never neglected or abused. The mother's mental retardation was not the reason for the order decreeing termination, but her alleged emotional instability. The personality characteristics ascribed to the mother, although not ideal, do not represent such a substantial departure from the norm as to consti-

**9.** 259 Or. 291, 486 P.2d 567 (1971).

**10.** At p. 573 of 486 P.2d.

tute a condition seriously detrimental to the child.

HENRIOD, C. J., and WILKINS, J., concur.

CROCKETT, Justice (dissenting):

The main opinion sets forth the essential facts of this pitiable situation with commendable candor and completeness. The trial judge appears to have given careful and thoughtful consideration to all aspects of the thorny problem it presents. His statements, including that quoted in the main opinion, indicate that he thinks there is neither a happy nor even a satisfactory solution; but that return of this unfortunately retarded child to this unfortunately retarded and limited mother presents an "impossible" situation, which would undoubtedly soon result in a renewal and continuation of the difficulties that have existed in the past, wherefore, the best solution available is to leave the child where he is.

It is my judgment that if the facts are looked at realistically in the light of the basic rules we have often expressed in such matters: that the paramount consideration should be the welfare of the child;[1] and that we should indulge considerable latitude to the discretion of the trial court,[2] there is no basis shown to justify overturning his findings and judgment. I would therefore affirm them.

ELLETT, J., concurs in the views expressed in the dissenting opinion of Mr. Justice Crockett.

---

1. See *Miller v. Miller,* 8 Utah 2d 290, 333 P.2d 945.

2. *State in Interest of K___ B___,* 7 Utah 2d 398, 326 P.2d 395.