**State of Utah in the Interest of WALTER B. (04–25–64), a person under eighteen years of age.**

**Appeal of JANE B.**

**No. 14864.**

Supreme Court of Utah.

March 20, 1978.

---

4. See Tribe, supra, note 2, at Chapter 16, Sections 2 and 3.

Gordon F. Esplin, of Salt Lake County Bar Legal Services, Salt Lake City, for appellant.

Robert B. Hansen, Atty. Gen., Franklyn B. Matheson, Asst. Atty. Gen., R. Paul Van Dam, Salt Lake County Atty., Olof A. Johanson, Deputy Salt Lake County Atty., David E. Littlefield, Salt Lake City, for respondent.

MAUGHAN, Justice:

Mrs. B., the mother of Walter B., appeals from a decree of the Juvenile Court terminating all of her rights, including her residual parental rights. This case is reversed and remanded to the Juvenile Court; because, as a matter of law, the grounds for termination under Sec. 78–3a–48(1)(a) have not been established.

The trial court ruled Mrs. B. was unfit by reason of conditions seriously detrimental to the child. The court found:

> The mother is emotionally stable but cannot properly care for the child; that the child has minimal brain disfunction, is intensely hyperactive, anxious and impulsive; that he responds to contacts by his mother in an emotionally explosive and destructive manner; that the child's physical and emotional condition and his response to the relationship with his mother, is a condition that is seriously detrimental to the child; that by reason of this condition the mother is rendered unfit to care for this child.

Thus, it is the alleged condition of the child which the court concluded rendered the mother unfit. May such construction be sustained under the law?

Section 78–3a–48, U.C.A.1953, as enacted 1965, provides:

(1) The court may decree termination of all parental rights with respect to one or both parents if the court finds:

(a) That the parent or parents are unfit or incompetent by reason of conduct or condition seriously detrimental to the child; . . ..

■ This statute was interpreted in *State In Interest of Winger*,[1] wherein it was ruled that the condition of the mother must have a seriously detrimental effect on the child. To sustain a termination, the characteristics ascribed to the mother must represent such a substantial departure from the norm as to constitute a condition seriously detrimental to the child.

Mrs. B. is the mother of five children; Walter is the youngest and at the time of the hearing was twelve years old. The older two children are adults and successfully established in the world. The middle two live with Mrs. B., and the state stipulated Mrs. B. had good parenting skills with these children.

Shortly after Walter's birth, Mrs. B.'s husband deserted her, and she was compelled to accept welfare. Walter's behavior was such a departure from the norm that Mrs. B. requested assistance when he was four years old. She was referred to Primary Children's Hospital, where Walter underwent extensive testing. Mrs. B. was informed he had minimal brain disfunction, and a medication was prescribed. No one explained that this term as applied to Walter meant he was hyperactive, and no training for the mother was provided. Walter participated in a head start program, where his behavior was noted as disruptive. He received group therapy at the Granite Mental Health Center for two or three months; thereafter the program was discontinued. Walter entered kindergarten and progressed through the first and second grades. His behavior was frequently outrageous, and his mother was compelled to supervise him constantly. Mrs. B. was still not provided with any counseling or training.

Walter entered third grade. The principal of the school contacted Mrs. B. a number of times to complain of Walter's behavior. Finally, Walter was expelled. Mrs. B. contacted welfare seeking assistance. The state rather than providing training and counseling for Mrs. B., removed Walter and placed him in a foster home on March 16, 1972, where he remained for the next 4½ years. This foster environment was evidently insufficient to resolve Walter's behavioral problems, since he came before the Juvenile Court on June 19, 1973 and was found to be in need of specialized care for his emotional problems. Mrs. B. was deprived of her custodial rights and he was placed with the Division of Family Services, hereinafter, D.F.S. Walter began treatment for his problems as an out patient at Primary Children's Medical Center in September, 1973. However, he continued to live with foster parents. The record does not indicate that D.F.S. devised any plan to reunite Walter with his family, viz., his mother, brother, and sister.

Two witnesses, a social worker, Mrs. Ferrugia, and a psychiatrist, Dr. Gill, testified that parents of hyperactive children are given special training to educate them how to care and cope with such children. Mrs. Ferrugia testified there are community resources available to train parents in such techniques as behavior modification. Dr. Gill explained that in private practice the entire family is educated in a series of three to six sessions; thereafter, periodic sessions are held as long as the child remains in treatment. Dr. Gill further testified that in private practice a hyperactive child is not removed from his home unless the child is uncontrollable. If such circumstances occur, the child is removed on a temporary basis, until his behavior becomes more appropriate.

A psychiatric social worker, Mr. Facey, and a psychiatrist, Dr. Goates, who are employed by the Primary Children's Hospital testified as to Walter's condition. Both were of the opinion that Walter's relationship should be terminated with his mother;

1. Utah, 558 P.2d 1311, 1316–1317 (1976).

however, their contacts were limited to two brief encounters with Mrs. B. One of these contacts was to show Mrs. B. a video tape of Walter expressing that he didn't love his mother and wanted his relationship with her terminated. Mr. Facey through an emotional appeal attempted to pressure Mrs. B. into voluntarily relinquishing the child. Her response he characterized as narcissistic. Mrs. Ferrugia witnessed this session and described Facey's questioning as inappropriate, because Mrs. B. was so overwhelmed with intense feelings from this traumatic experience. Mr. Facey admitted his contacts were so limited with Mrs. B. he couldn't diagnose her.

The opinion of Dr. Goates appeared to be based primarily on a second video tape of Walter and Mrs. B. He interpreted the mother's appeal to Walter as made on a basis of guilt and her emotional need for him. The doctor was of the opinion Walter did not have the capacity to meet his mother's emotional needs and wanted the relationship terminated.

Dr. Gill, who was employed to do a psychiatric evaluation of Mrs. B. did not find her to have narcissistic characteristics. He testified Mrs. B.'s resistance to termination indicated she had enough self-esteem and enough self-pride to fight for what she believed was right, viz., a parent should have an on-going relationship with his child. He described Mrs. B. as highly motivated concerning Walter.

Dr. Gill recommended the relationship not be terminated, but should be reestablished and strengthened. He explained Mrs. B. was emotionally stable and a loving, caring parent. She was able to parent adequately, and a relationship with Walter was important to her. He believed Mrs. B. should visit with Walter on a regular basis. He was unable to give his expert opinion concerning Walter, because the foster parents had cancelled the appointment to interview Walter. This fact points up one of the major inadequacies of the instant record; the experts with knowledge of Walter's condition had never examined the mother. The expert who had evaluated the mother was prevented by the foster parents (upon advice of an agent of the state) from contacting Walter.

The finding of the Juvenile Court that Walter responded to contacts by his mother in an emotionally explosive and destructive manner was primarily based on a calendar kept by the foster parents over a period of four and ½ years. Mr. Facey's testimony as to Walter's reaction had to be predicated on this information, since Walter had only one brief contact on his birthday with his mother after the time Facey commenced working with him (after January 1, 1976). It should be interjected that Mrs. B. had been denied visitation with her son at Christmas, and on his birthday. She disobeyed by taking gifts to the foster home; and on his birthday she had personal contact with him.

Her violation of the rules set by Miss Lantz, the social worker assigned to Walter's case, appeared to precipitate this proceeding. One of the allegations in the petition filed by Miss Lantz was that Mrs. B. had failed and refused to cooperate in the treatment of the child. Since the evidence overwhelmingly indicated Mrs. B. was never given an opportunity to participate in the treatment of the child, this allegation was nonsense. It appears the state's conception of failing and refusing to cooperate is the refusal to give up one's child without a struggle.

The calendar was kept on the wall where Walter could observe it. After each visit with his mother an entry was made indicating any bad behavior. Significantly, there was no log of his daily behavior to contrast with the alleged precipitating event. Walter testified his foster mother kept the calendar so she would have it when she needed it. Walter related that everyone expected things to happen after he visited his mother; in fact, he knew they were going to happen. He testified the calendar indicated that after one visit he phoned a bomb threat.

Dr. Gill testified that in his opinion the proceeding represented two sets of parents fighting over a child they loved, viz., the situation had degenerated to warfare. The

calendar was partially kept maliciously, as a way to prepare to do battle. Dr. Gill expressed the opinion it would be possible for a hyperactive child to develop a subconscious expectation that, after a particular stimulus, a particular result was expected of him. In other words, it was possible that in Walter's mind there had been some conditioning concerning his visits and what happened thereafter.

Walter's testimony indicated the environment of his foster home had stimulated his disapproval of his mother. His foster parents first informed him about permanent deprivation. He testified he desired the proceeding, because he had a better mother, who loved him more than his real mother. He explained his real mother was not a good mother in that she smoked and drank and didn't attend church. He testified he had joined his foster parents' religion, and his foster father held an important position in their church. Walter stated he was tired of trying to change his mother, and he didn't miss his brother and sister. He was happy with his foster parents. He testified his mother did not mean it when she said she loved him, if she did she'd adhere to his religious tenets.

Walter was interrogated as to what his mother must do if she desired to go together with him. He responded she must stop smoking and drinking, join his religious faith, and be married in a religious ceremony. He testified that he would go back and live with her if she would "straighten up."

A review of Walter's testimony indicates this emotionally disturbed child did not realize the consequences of his actions; in spite of the testimony that permanent deprivation was explained to him.

Dr. Gill testified that frequently children will say they don't love a parent. In Dr. Gill's opinion there were several reasons why Walter may have expressed his negative attitude towards his mother. He may have received messages from professional people that his foster home was better for him. He may like the economic level he enjoys in his foster home. He may be concerned the foster parents will reject him if

he changes sides. The foster parents may be manipulating him in the belief it is in his best interests, and they may have forced him to take sides. In Walter's mind he feels that he must choose one or another and that he cannot be shared by two families.

Mr. Facey's testimony coincides with Dr. Gill's opinions. Mr. Facey stated Walter wanted termination so he could invest all of his energy in his foster parents, where he was going to be and where it was best for him. Walter's relationship with his mother was described as a piece of "bad plaster" in the ceiling, hanging over him, and he was forever anxious the relationship was going to descend on him again. Walter was adamant in his desire to have termination. Facey's explanation as to Walter's feelings was that Walter recognized there was a "bad piece of personal and emotional chemistry" between him and his mother.

Mr. Facey testified that Walter was intensely hyperactive and had been emotionally demolished by repeated experiences of failure. Walter had very poor judgment, poor memory, poor reasoning, and tended to get in trouble repeatedly. He had developed a sense of worthlessness and required a special kind of parent. Mrs. B. for all her good will could not be that kind of parent, the foster parents were better for him. Mr. Facey was of the opinion that permanent deprivation was absolutely in Walter's best interest. He testified that he was an advocate for Walter.

Mr. Facey explained that Walter's minimal brain disfunction caused his judgment to arrive a fraction of a second after he had already acted on his impulses. Walter was very impulsive and any increase in his anxiety increased his level of impulsivity.

Mr. Facey further testified he first met social worker Lantz in May, 1976. Miss Lantz expressed the opinion that termination was advisable. Mr. Facey testified that the principal reason Walter did not want to see his mother was that Walter anticipated trouble. He stated he had had contacts with the foster parents over a period of several months and the environment

they provided was better for Walter than his mother's. He conceded that 50 to 70 percent of hyperactive children have a spontaneous reversal of that condition at puberty. He did not explain the effect this might have on Walter.

Mr. Facey testified that permanent deprivation was a piece of psychological surgery right now to remove an enormously contaminating influence in Walter's life. Walter needed to be relieved of enormous pressure while reserving the right to go back as an adult. At present Walter would not give his mother an opportunity to be his mother, later on he might. He related that Walter's relationship with his mother could not be restructured because of Walter's unwillingness. He did not question Mrs. B.'s adequacy to parent her other children.

Social worker Lantz testified she never devised a treatment plan or strategy to encourage or strengthen the relationship between Mrs. B. and Walter. She did not think the relationship between the two was worth preserving. Miss Lantz advised the foster parents to cancel the appointment with Dr. Gill. Mrs. Ferrugia, a social worker testified the only treatment plan devised was to deprive Mrs. B. permanently. It was Mrs. B.'s testimony that she was never given any training on hyperactivity, except what she had learned in court at the termination hearing. Her testimony was not challenged.

On appeal Mrs. B. contends it was error to terminate her rights when the D.F.S. had failed to provide her with training to deal with her intensely hyperactive child. Her counsel in an argument to the Juvenile Court drew an analogy between Walter's minimal brain disfunction and a child with kidney disease. The state could not terminate a parent who did not own or have the ability to operate an artificial kidney machine. The court rejected this argument.

The state in its brief argues that even if the state acted improperly under state and federal regulations in failing to give the mother appropriate assistance, the remedy is not reversal of the termination decree. The state urges, if it neglected the mother, perhaps she has an action for damages against the state. Strange, indeed, is this argument.

■ Deprivation of parental rights is a drastic remedy, which should be resorted to only in extreme cases; where it is clearly manifested the home cannot or will not correct the evils which exist. The severing of family ties is a step of utmost gravity both socially and economically.

■ In *State v. Lance*[2] this court ruled that a termination decree could not be sustained where there was no evidence the mother was informed of the alleged inadequacies of the environment she was providing, and she was not advised of appropriate remedial action.

There was not a scintilla of evidence that the home itself 'cannot or will not correct the evils which exist.'

Thus it is a condition precedent to termination that the conduct or condition alleged to be seriously detrimental to the child cannot be corrected, after notice and opportunity implemented, by reasonable efforts of assistance.

In the instant case there is no evidence Mrs. B. was offered training to care for her child. It can be inferred training was provided the foster parents. Mr. Facey testified as to his contacts with the foster parents. Throughout the record, those advocating termination reiterated the foster home was a better environment for Walter, and termination was in his best interest.

■ A parent has a fundamental right, protected by the Constitution, to sustain his relationship with his child. The legislature has implemented this constitutional design by limiting termination of parental rights to the specific grounds set forth in section 78–3a–48. A parent's rights cannot be severed, because another can provide a better home. The statute does not provide that termination may be predicated on the best interests of the child; this is a standard

**2.** 23 Utah 2d 407, 413, 464 P.2d 395 (1970).

applicable to a custody disposition. The best interests of the child may be a resulting benefit, but it cannot be the primary point of departure, upon which termination hinges. When a termination of parental rights is involved, there must be strict adherence to the express statutory grounds.

■ Here, there is strong evidence of a distortion of justice. An emotionally disturbed child has been deliberately isolated from his natural parent and subjected to influences designed to restructure his life without the presence of "this contaminating influence." The record does not reveal any concrete facts concerning the mother's condition. The term "bad chemistry" is not a substitute for specific facts. The reluctance to permit an evaluation of the child by one, who is not a professed advocate of his, indicates a professional judgment by some who will not brook a challenge. The strong evidence of manipulation of the child undermines the decree. The mother's alleged inability to care for the child is not analogous to the condition of a psychotic mother with a poor prognosis. Mrs. B.'s inability is a lack of training, which any parent of a severely hyperactive child requires. The child's alleged refusal to have any contact with his mother should be evaluated by an unbiased professional to determine if the cause be one of those suggested by Dr. Gill.

Under the present state of the record, the decree of the Juvenile Court cannot be sustained.

WILKINS, J., concurs.

HALL, J., concurs in result.

CROCKETT, Justice (dissenting).

It is my impression that in setting forth certain portions of the evidence to reach its result, the main opinion departs from important and fundamental principles: that due to the advantaged position and responsibilities of the trial court (in this instance the Juvenile Court) we should allow it the prerogative of finding the facts; and that, where there is dispute, we should assume that the court believed those aspects of the evidence which support its findings and conclusions.[1]

Walter will be 14 years old next month (April, 1978). His maladjustment is sufficiently severe that he has spent the largest part of his life as a ward of the state in foster homes; and the strong likelihood is that this will continue during his minority and on indefinitely until and unless his difficulties are sufficiently remedied that he can become a self-sufficient individual. The main consideration for the trial court was, and for this Court should be, the accomplishment of that objective in the best interests and welfare of Walter, rather than the relative fault or innocence of the appellant or anyone else involved in the proceeding.[2]

In that regard it is significant that the appellant is not asking for Walter's custody and seeks no association with him. These things she admits in her own testimony; and further, that she does not feel that she can do him any good. What she says is that she doesn't feel that it is right that she should be denied being his mother. She only wishes to preserve that legal relationship, even if it is not in the best interest of the child.

This provides support for the testimony of Dr. Delbert Goates, child psychiatrist at Primary Medical Center. He testified that appellant has a narcissistic (that is, excessive self-love) character disorder, so that she is more concerned with the negative effect of the judgment on her, than she is with the positive effects it may have on Walter. Dr. Goates saw little likelihood of the relationship between Walter and his mother becoming more stable in the foreseeable future; and he recommended permanent termination of the relationship.

1. *State v. Dade*, 14 Utah 2d 47, 376 P.2d 948. That case also sets forth my ideas as to this court's affirmance of social surgery where necessary to prevent a continuation of existing evils.

2. That the welfare of the child is the paramount consideration, see *Miller v. Miller*, 8 Utah 2d 290, 333 P.2d 945.

This diagnosis and recommendation is the same as that of social worker Edward Facey, who had worked with Walter for approximately seven (7) months. He testified that the boy has severe problems; and that the relationship is "very hurtful to this child and it provides no redeeming benefits to help pay for the pain that accompanies it"; and that contacts with his mother would result in "massive regression" for Walter.

According to the professionals just referred to, and other supporting testimony, the attitude of Walter himself is totally antagonistic to his mother. Dr. Goates said that this attitude of Walter was "not on an impulsive basis," nor one fed to him by those around him, but was a "long-term, well-reviewed decision." Further, that although the boy harbors an "enormous sadness" that the relationship with his mother could not work, he recognizes that it was a destructive relationship that was "wrecking his life"; and he "adamantly desired to end the relationship." It should also be observed that Dr. Gill, upon whom appellant seems to place reliance, had never met nor examined Walter; and that even he recommended continuing psychotherapy for the appellant.

Implicit in the position of the appellant is the idea, somewhat strange and impractical to me, that the state should assume the responsibility, not only for supporting, caring for, and training this maladjusted boy, but that this should extend to taking similar responsibility for the parents of such children; that it is at fault for not doing so, and should be prevented from taking remedial action for the child until it cures the parent.

The main concern of the trial court did not appear to be whether its order constituted some kind of a "judgment" or of a penalty upon the appellant.[3] It is not necessary that the appellant be found guilty of any crime, nor even of any wilful or intentional wrongful conduct.[4] For whatsoever unfortunate and regrettable cause, his relationship to his mother, and equally important, her relationship to him, are such that the trial court has properly perceived and concluded it is wholly unrealistic to suppose that there is any value in it to either of them. In that regard the court's findings include:

. . . that *the child has* minimal brain dysfunction, is intensely hyperactive, anxious and impulsive; that *he responds* to contacts by his mother in an emotionally explosive and destructive manner; that the *child's physical and emotional condition* and *his response* to the relationship with his mother, is a condition that is seriously detrimental to the child; *that by reason of this condition the mother is rendered unfit to care for this child.* [Emphasis added.]

There is this thought which also has a bearing on this situation: if there is indeed any value to be salvaged in the child-parent relationship, it could and likely would persevere and be recaptured sometime, without much help or hindrance because of the technicality of legal status herein dealt with.

In accordance with what has been said herein, it is my opinion that if this entire record is surveyed in the light of the established rules of review, allowing the Juvenile Court its prerogative of finding the facts, and of exercising its judgment as to the best interest and welfare of this child, there is no basis shown which should persuade this Court to disturb the findings and order made. I would therefore affirm them.

ELLETT, C. J., concurs in the views expressed in the dissenting opinion of CROCKETT, J.

---

3. That the long-term interests of the child should supersede the emotional needs of the parent, see *State in Interest of A*, 30 Utah 2d 131, 514 P.2d 797.

4. U.C.A., 1953, Sec. 78–3a–48, authorizes deprivation of parental rights when (a) the parent is unfit or incompetent by reason of conduct *or*

*condition seriously detrimental to the child*: (Emphasis added); and see *State in Interest of Jennings*, 20 Utah 2d 50, 432 P.2d 879, affirming termination of parental rights where emotionally unstable mother could not provide proper care and supervision.