STATE of Utah, in the Interest of E.
and B., persons under eighteen
years of age,

v.

J. T., Appellant.

No. 15140.

Supreme Court of Utah.

April 11, 1978.

Blackham & Boley, Don Blackham, Patricia DeMichele, David S. Dolowitz, David E. Littlefield, Salt Lake City, for appellant.

Franklyn B. Matheson, Asst. Atty. Gen., Robert B. Hansen, Atty. Gen., Olaf Johansson, Deputy Salt Lake County Atty., Salt Lake City, for respondents.

WILKINS, Justice:

Appellant, the mother of E. and B., ages 10 and 7, respectively, appeals from an order of the Juvenile Court, Second District, terminating her parental rights. The father's rights were also terminated by the Juvenile Court order, but he has not joined this appeal. All statutory references are to Utah Code Annotated, 1953, unless otherwise indicated.

The Juvenile Court terminated Mrs. T's parental rights to E. and B. on the grounds (1) that she was unfit and that (2) she had abandoned these children, within the mean-

ing of Section 78–3a–48(a) and (b)[1], which provides:

The Court may decree a termination of all parental rights with respect to one or both parents if the court finds:

(a) That the parent or parents are unfit or incompetent by reason of conduct or condition seriously detrimental to the child; or

(b) That the parent or parents have abandoned the child.

The evidence shows that appellant married her present husband July 6, 1973, and in February 1974, voluntarily placed all five of her children by a previous marriage with the Division of Family Services. She testified that at that time she needed to solve problems of a financial nature, had an alcoholic husband, and wished to see the children in a stable environment while she solved these problems so she could later bring them home. The three older children were placed in foster care in one home. E. and B. are the youngest, and were placed together in another foster home.

The social service caseworker assigned to the cases of E. and B. allowed the mother to visit these children in appellant's home on March 12, 1974. She was again allowed to visit in June, 1974, but at the Division's offices.

In July 1974, appellant and her husband moved to Denver, Colorado, where appellant secured a job.[2] On September 6, 1974, the caseworker sent a letter to appellant that if she wanted her children returned to her, she must (1) return to Salt Lake City, (2) obtain an adequately sized apartment to accommodate the children and (3) make a determination as to whether the children should live in the same home with the stepfather.

Appellant responded by writing to E. and B., sending the letter through the caseworker, as she had not been informed of the children's address or phone number. The letter is dated September 17, 1974. Therein, appellant told the children that she loved them, and would return to Salt Lake City to reunite the entire family as soon as she was able to raise enough money. The caseworker wrote to appellant referring to this letter and asking her not to make promises to the children which she could not keep. The caseworker also asked appellant to contact Dave Christensen, social worker, to establish a plan for the return of her children. Appellant wrote to Christensen on October 17, 1974, asking what she could do to have her children returned to her. Christensen responded on November 18, 1974, by letter stating that if appellant decided to stay in Denver she should request a home evaluation from the Denver welfare department; but that she should also consider (1) whether she wanted the children to live with the stepfather, and (2) whether she could ever provide an adequate home for them.

At approximately this time, a new caseworker, Ms. Bowles, was assigned to work with E. and B. On December 7, 1974, appellant wrote to Ms. Bowles of her intention to return to Salt Lake City on the 16th of December 1974. She said she thought she could get a job with McDonald's Candy Company, and it was her intention to make a home for the children in Salt Lake City. She wanted the children replaced in her home. Appellant arrived in Salt Lake City, and was allowed to visit her older three children, but Ms. Bowles refused to allow her to visit E. and B., saying it was not in the "best interest of the children." Appellant had Christmas gifts for all of her children, and she gave those for E. and B. to her older children for delivery. At the time of the hearing on this matter, no one could say whether these presents were ever delivered to E. and B.

Appellant was unable to obtain employment in Salt Lake City, and returned to her job and her husband in Denver after Christ-

---

1. This section was numbered Sec. 55–10–109 in the Utah Code Ann. at the time of the hearing on this matter.

2. The family was on welfare while they were in Salt Lake City, as neither Mrs. T nor her husband was working. While in Denver, the husband was adjudged disabled, and is now drawing social security payments.

mas. She arranged for the Denver Department of Social Services to make an evaluation of her home, and leased a three bedroom apartment. She communicated these arrangements to Ms. Bowles in February, 1975. The Denver evaluation was favorable to appellant and her husband, and was received by Ms. Bowles in June of 1975. However, Ms. Bowles testified that she did not believe the evaluation was of sufficient depth; she was reluctant to return the children to a home where the husband was drinking; that she knew appellant's husband was still drinking for she had reports that he was attending Alcoholics Anonymous regularly; that she had met appellant only once, had never met the husband and had no personal knowledge of the conditions of the home. Instead of taking steps to have the case transferred to Denver, she asked the Denver office to make another evaluation.

In July, 1975, appellant again arrived in Salt Lake City and visited with her older children. She was not allowed to visit with E. and B. as she was told they were out of town on vacation with the foster parents. Ms. Bowles' testimony in this regard is somewhat ambiguous. She said that she had no advance notice of appellant's visit, yet she also testified that because appellant was in Salt Lake City, she had an extensive conversation in July with the foster parents concerning the preparation of E. and B. for the possibility of returning to their natural mother.

Appellant returned to Denver, August 5, 1975, and engaged the services of an attorney there in the latter part of that year to help her regain custody of her children. He suggested the name of an attorney in Salt Lake City who could help her, Mr. Glenn Hatch.

On February 9, 1976, Ms. Bowles wrote to appellant asking if she had any desire to regain custody of her children. On February 14, 1976, appellant and her husband wrote to Ms. Bowles as follows:

In reply to your letter of Feb. 8, 1976; We have, as always every intent to regain custody of our children. We have retained legal counsel to assist us in this matter so that it can be handled in the manner most expedious [sic] and beneficial to all concerned. In view of present circumstances, and past experience, we request that you refer any further action or inquiry necessary on your part, directly to either of our attorneys, as set forth below: . . .

The caseworker received a call from Mr. Hatch, who worked for the return of the children, but he died later that spring.

Ms. Bowles petitioned the Juvenile Court to deprive appellant of her parental rights in August of 1976. The second evaluation of appellant's home was received from the Denver Department of Social Services during the hearing on this matter, and was also favorable to appellant. The Denver office recommended return of the children, and offered to continue to supervise the children's adjustment to their home in Denver.

Appellant was never given the name of the foster parents who were caring of E. and B., nor was she given the address or phone number where she could reach them, though she had this information concerning the older children, and was allowed to visit the older children each time she was in Salt Lake City.

■ Appellant first argues that the facts of this case are insufficient to support finding of unfitness or incompetency under Section 78–3a–48(a).

The Juvenile Court found that the appellant has borderline mental ability, has difficulty coping with stress, has a high anxiety level, is ambivalent, has difficulty making decisions, has borderline autistic thinking, borderline functional psychotic and latent-type schizophrenic disorder. The Juvenile Court found that the mother was "doubtfully capable of providing for the needs of the children."

This finding was taken from statements contained in the written report of Gordon G. Wilson, Ph.D., based on his psychological examination of appellant in Denver, Colorado. His report was entered into evidence without objection.

Nevertheless there was no evidence presented, nor did the Court find, that ap-

pellant's psychological characteristics were in fact detrimental to the children. Dr. Wilson reported that these characteristics were "borderline" and "latent." No evidence was presented as to the effect, if any, these conditions had on the children. This Court has held that the characteristics ascribed to the parent must represent such a substantial departure from the norm as to constitute a condition seriously detrimental to the children.[3]

In determining that the mother had abandoned these children, another ground for termination, the Juvenile Court concluded that "the mother's conduct has evidenced a conscious disregard for her parental obligations, and that this disregard has led to the destruction of the parent-child relationship, . . ."[4]

The Juvenile Court based its conclusion of abandonment on the following findings of fact:

(1) That the mother has visited the children twice between February and June 1974, and has not visited since that time; although the mother was denied visits on two occasions, she has visited Salt Lake City six to eight times since June of 1974 when she moved to Colorado.

(2) That the only positive steps taken by the mother to affect [sic] return of these children has [sic] been phone calls and letters to the Division of Family Services, a request for a home study in Colorado, and the leasing of a three bedroom home.

(3) The mother has not supported these children although she has had regular employment since October, 1974.

(4) The mother has not provided emotional support for said children. She has not sent Christmas gifts (except Christ-

mas 1974) or birthday cards; the mother wrote one letter to the children.

(5) That both children regard Mr. and Mrs. R. foster parents, as their psychological parents; that B. believes his natural mother is dead, and that both boys have had no contact with the mother for a period of over two and one-half years.

Appellant argues that these findings of fact are not supported by the evidence, and also that the findings are not sufficient to conclude that she consciously disregarded her parental obligations. As hearings in the Juvenile Court are equitable in nature[5] this Court has the responsibility to review both the facts and the law and make its own findings and substitute it judgment for that of the lower court,[6] if the evidence clearly preponderates against the findings as made, or if the Court has abused its discretion.[7]

We do not see that under these circumstances the evidence shows a disregard of her parental obligations on the part of appellant. Rather we believe it shows a disregard of appellant's parental rights on the part of the Division of Family Services, and a frustration of her efforts to regain custody of her children.

The Court found that appellant had not visited these children since she moved to Colorado, though she had been in Salt Lake City six to eight times since 1974. Appellant's counsel asked her if three or four of these trips to Salt Lake City had been for the purpose of attending the hearings on this petition, and that she had requested and been denied visitation each time, but the Court sustained objections on the ground of irrelevancy, since those actions were taken after the filing of the petition. If the Court states in a finding that appellant has been to Salt Lake City six to eight times without visiting the children and that

3. *State in the Interest of Winger*, Utah, 558 P.2d 1311 (1976). See also the recent case of *State in the Interest of Walter B.*, Utah, 577 P.2d 119 (1978).

4. See *State in the Interest of Summers Children v. Wulffenstein*, Utah, 560 P.2d 331 (1977), where this Court adopted this rule in abandonment cases.

5. Section 78–3a–44(1).

6. *Mitchell v. Mitchell*, Utah, 527 P.2d 1359 (1974).

7. *State in the Interest of K–B*, 7 Utah 2d 398, 402, 326 P.2d 395 (1958).

finding is predicated on her testimony in one of the hearings, then the Court should not have precluded testimony in explanation of these visits, whether they occurred before or after the filing of the petition. We perceive that an objection on irrelevancy may lie generally to one's actions after a petition filing but not in this context because the finding of six to eight visits—devoid of explanation—leads to an adverse conclusion against appellant that she frequently visited Salt Lake from Denver but with disregard for her children. Consistently throughout the proceeding, appellant said that she thought that it had been determined that she should not see her children. Dr. Wilson reported that she gave him this same information. There is no evidence in the record that appellant had ever failed to request visitation when she was in Salt Lake City.

Similarly, the Court found that appellant had not supported the children emotionally as she had not sent them Christmas and birthday gifts or letters. Yet when she did send Christmas gifts in 1974, no one could say whether they were delivered, and when she wrote a letter to the children she was immediately admonished by the caseworker not to make promises she could not keep. The Division kept the information of the children's whereabouts a closely guarded secret, and no phone number or address was provided to appellant for communication with these children. Each attempt at communication was monitored by the Division. Each request for visitation was denied.

The record clearly shows a frustration of appellant's efforts to remain in contact with these children, though she was allowed these rights to visit and communicate with her older children, who were under the supervision of a different caseworker.

The Juvenile Court found that the *only* positive steps taken by the mother to effect return of the children were that she had communicated with the Division of Family Services, had requested a home evaluation in Denver and had leased a three-bedroom home to accommodate the children.

The record shows that appellant followed closely the instructions of the Division and accomplished those which were reasonable requirements. She also took positive steps other than those recounted by the Court.

Appellant asked for instructions twice as to what she was required to do to have her children returned. She was instructed that she should arrange for accommodations which were adequate to house five children, and have her home situation evaluated by the Department of Social Services in Denver. With these two matters, she complied, and received favorable recommendations from the Denver office, twice.

Appellant was also told that she must prove that she was able to support the children, but nevertheless must return to Salt Lake City, where she was unable to secure a job. She was also in effect informed repeatedly that she must divorce her husband. That this was in fact the condition demanded is exemplified by the question propounded by the state's attorney at the hearing. He asked if she had not made a conscious choice between her husband and her children. Her answer was an emphatic "no!" These two requirements, appellant did not meet.

Ms. Bowles testified that she was of the opinion that appellant had taken no action to solve her problems, and therefore recommended that she be deprived of her parental rights. Appellant had secured a job in Denver, and was no longer receiving welfare payments. Such actions should be encouraged. Appellant's husband sought and received medical advice and was at least attempting to address his alcohol problem. These were the problems which led appellant to place the children with the Division initially. But these positive steps were not listed by the Court in making its findings of fact. The Denver Department of Social Services reported that the home conditions were satisfactory, that these people were learning to solve their problems, and offered to help in the supervision of the readjustment of the children to their home. This evidence was rejected by the Court in favor of the testimony of Ms. Bowles, who had met the mother once, her husband never and had never seen the kind of home these people could provide.

The Court found that appellant had not supported the children while they were in foster care. Though appellant requested instructions regarding what she must do to have her children returned, she was never advised that she should send support money. The Juvenile Court has the power to order a parent of children under its jurisdiction to provide all or a part of the children's support under the provisions of Section 78–3a–49. There is no order of the Court for such support payments in the record, and there was no evidence presented at this hearing concerning what amounts appellant could afford to pay for their support, as is required under the provisions of said statute. This Court has held that a parent must be advised of alleged inadequacies and advised of appropriate remedial action so that she might have an opportunity to improve those conditions before those inadequacies may be made a basis for termination of parental rights.[8]

Finally, the Court found that the children had not seen their mother for two and a half years, and that they now regard their foster parents as their "psychological parents." This is a natural consequence of the actions by the state as mentioned ante. Ms. Bowles testified that it was not her job to remind the children that they had a mother, that she worked with the foster parents, rather than the children, and that she did not know what the foster parents had told the children concerning their mother's whereabouts during this period.

One of the basic purposes of the Juvenile Court Act is stated to be ". . . to preserve and strengthen family ties whenever possible . . . ."[9] We do not believe that the Juvenile Court has taken this provision sufficiently into consideration in this case. This Court has repeatedly stated that total deprivation of parental rights is a drastic remedy, which should be resorted to only in extreme cases in which it is clearly manifested that the home cannot or will not correct the evils which are deemed to exist there.[10] In this case the evidence produced does not, as a matter of law, justify the state's resorting to this drastic remedy.

The Juvenile Court Order terminating appellant's parental rights is reversed.

MAUGHAN and HALL, JJ., concur.

CROCKETT, Justice (dissenting):

Though the detail of the facts are different, the problem confronted herein is comparable to that in our recent case of *State in the Interest of Walter B.*, Utah, 577 P.2d 119 (issued March 20, 1978). Therefore, in order to spare further exposition here, I refer to the dissent therein. Based upon that reasoning as to such a fact situation, and the applicable principles of law, including proper deference to the prerogatives and the responsibility of the Juvenile Court, and the desirability of working toward a more stable and satisfactory adjustment of these children for coping with the problems of life, I would affirm the judgment.

I also concur in the comments of Chief Justice Ellett.

ELLETT, Chief Justice (dissenting):

I concur with the dissenting opinion of Justice Crockett, but wish to state another reason for dissenting.

As stated in the main opinion the trial court found that the appellant has a borderline mental ability, has difficulty making decisions, has borderline autistic thinking, borderline functional psychotic and latent-type schizophrenic disorder and that the mother was doubtfully capable of providing for the needs of the children.

Since the welfare of the children is the principal concern of the courts, I cannot agree to reverse the ruling of the juvenile court in this case. I think it would be tragic to place the children under her control.

It may be that the social agencies of the state could have done more to get mother

**8.** *State v. Lance*, 23 Utah 2d 407, 464 P.2d 395 (1970).

**9.** Section 78–3a–1.

**10.** *State v. Lance*, supra, footnote 6; *State in the Interest of Winger* and *State in the Interest of Walter B.*, both footnote 3, supra.

and child together—but in the wisdom of the professional agencies of the juvenile court and the judge thereof it was decided that the welfare of the children would best be served by terminating the parental rights of the appellant.

I too would affirm the order of the trial court.