464 P.2d 395

STATE of Utah In the Interest of Inez PILLING, Donna Pilling, RaNona Pilling, and Cody Earl Peterson,

v.

Donna LANCE, Appellant.

No. 11181.

Supreme Court of Utah.

Jan. 19, 1970.

2. Reasonably implying that there was sufficient hay left to support a $7,000 insurance risk.

Ronald N. Boyce, Salt Lake City, for appellant.

Vernon B. Romney, Atty. Gen., Ralph A. Raat, Asst. Atty. Gen., Salt Lake City, for respondent.

CALLISTER, Justice.

Donna Lance appeals from a judgment of the Juvenile Court, wherein she was deprived of the guardianship of her three daughters, Inez, Donna, and RaNona Pilling, who were placed with their father, and was permanently deprived of all parental rights to her son, Cody Earl Peterson, whose guardianship was vested in the State

Department of Public Welfare for placement in a suitable adoptive home.

The court terminated appellant's parental rights on the ground set forth in Section 55-10-109(a), U.C.A., 1953, as amended 1965, namely, that Donna Lance was unfit or incompetent by reason of conduct or condition seriously detrimental to the children. The court found that appellant had failed over the past two years to provide a stable home for the children and to provide dental care for Inez and Donna after being advised of the need for such care.

The court supported its conclusion with the following findings: Donna Lance has moved nine times and has left the children with relatives, and said action has resulted in interference with adequate educational, social, and psychological adjustment of the children; during the 1966–67 school year Donna and Inez were enrolled in three different schools; the school social worker described Donna as the most frightened, disturbed, unhappy child she has ever met; that Inez has the same symptoms but not as severe in her disturbance; these symptoms may be attributed to two reasons: (a) lack of stability caused by frequent moves, change of schools, and the necessity of meeting new people, (b) lack of learning ability (I. Q.) on the part of the children. The court recited the dates of three marriages of Mrs. Lance between September 7, 1964, and April 1, 1966; on December 2, 1966, she married Myron Lance, who was shortly thereafter (December 22, 1966) arrested and convicted of murder. The court stated as a finding of fact that Mrs. Lance was found guilty of attempting to bring an instrument into the prison to facilitate her husband's escape and was sentenced to the Utah State Prison for six months to three years in December of 1967; the mother was presently at the prison.

The court further found that Wayne Peterson, father of Cody Earl Peterson, had refused to provide any child support and had thus demonstrated his incapacity to care for the child; that he had, therefore, deserted and abandoned the child; that Clarence Pilling, the father of the three Pilling girls, was capable of providing a suitable and adequate home for his children; that Cody Earl Peterson was in need of a secure, stable home environment and had been subjected to tremendous insecurity and poor care because of his mother's incompetence and therefore Wayne Peterson and Donna Lance should be deprived of all parental rights and the child placed for adoption.

Deprivation of the parents' custody of their children is a drastic remedy which should be resorted to only in extreme cases and when it is manifest that the home itself cannot or will not correct the evils which exist. The cutting of family ties is a step of utmost gravity and is undesirable

both socially and economically and should be avoided unless that is the only alternative to be found consistent with the best interests of the children. There is a presumption that it is generally for the best interest and welfare of children to be reared under the care of their natural parents.[1] Under this presumption the burden of persuading the trier of the fact is always on the person who claims that it will be for the best interests of the child to be reared by someone other than the natural parents of such child.[2] To support a decision to deprive the parent of its child the court must first be convinced of such fact by a preponderance of the evidence.[3]

In Section 55–10–32, U.C.A., 1953, the predecessor statute to Section 55–10–109, the legislature specified certain factual situations (such as conviction of a felony) that would constitute grounds to deprive a parent of the custody of his child, regardless of the effect of such facts upon the child. The legislature has, in a sense, narrowed the grounds in Section 109 to those situations where the acts of the parents (although unspecified) have a *seriously detrimental* effect on the child.

Appellant asserts that the findings and conclusions of the Juvenile Court are insufficient as a matter of law to support the judgment. With this contention, we must agree, for there is insufficient evidence in the record to indicate the effect of the acts of Mrs. Lance on her children.

There were two witnesses who testified as to the unfitness and/or incompetency of Mrs. Lance: Miss Brown, a caseworker for the Department of Welfare, and Mrs. McKay, a Salt Lake City School social worker. Neither lady had ever contacted Mrs. Lance personally nor observed her home and care of the children.

Mrs. McKay never contacted Inez personally but merely discussed her with her teachers. She did not recommend any psychological testing of Inez, since she did not feel it was necessary. She described the girls as not being physically deprived in dress or cleanliness and admitted that their attendance records did not indicate an unusual amount of absences.

Mrs. McKay saw Donna twice weekly from February until the close of the school year. Donna was referred to her because she was a nonreader, repeating the first grade, in a new experimental classroom, wherein ninety children were grouped together with three teachers. According to Mrs. McKay, Donna's emotional problems were manifested in tears, withdrawal, lack of communication, and ability to learn.

1. See Section 55–10–100(18), U.C.A., 1953, as amended 1965; State in interest of F v. Dade, 14 Utah 2d 47, 376 P.2d 948 (1962).

2. Fronk v. State, 7 Utah 2d 245, 256, 322 P.2d 397 (1958).

3. In re Bradley, 109 Utah 538, 550, 167 P.2d 978 (1946).

Mrs. McKay stated that usually she consulted with the parents of a disturbed child she was treating, but since Mrs. Lance was a "welfare mother," she notified Mrs. Pearce, the caseworker. Mrs. McKay stated that her treatment brought tremendous improvement in Donna.

Mrs. McKay testified that the changing of residences was a contributing factor to the children's emotional problems; however, Donna's limited intelligence was also a strong contributing factor in her emotional makeup. Since Inez had a higher I. Q., her emotional problems were not as severe as Donna's.

There is nothing in the record to indicate the qualifications of Mrs. McKay to diagnose and treat an emotionally disturbed child, since the court foreclosed inquiry by counsel and stated that she was qualified.

Miss Brown had Mrs. Lance assigned to her welfare caseload during the month of June, 1967, the time when Mr. Pilling took summer custody of the three girls in accordance with a divorce decree. Miss Brown did not contact Mrs. Lance during June but assumed that Cody Peterson was residing with his mother. During July, Miss Brown visited the home of Mrs. Gamble, the mother of Mrs. Lance, where Cody was residing; she proffered no testimony of any unfavorable circumstances in the Gamble home.

Miss Brown had in her case records a report from the University Medical Center, dated August 30, 1966, which stated that Inez and Donna needed dental care, x-rays, and restoration. She doesn't know if Mrs. Lance received this information.

Miss Brown testified that she had visited the Pilling home, which she found well kept. The little girls seemed to be quite happy. This is the sole evidence in the record to support the court's finding that Clarence Pilling was capable of providing a suitable and adequate home for his children.

Mrs. Lance offered rebuttal testimony, which from the findings of the court one must conclude that the court disbelieved. She explained some of her various moves: one dwelling was temporary headquarters when she returned from Texas with her children; one was too expensive when school began, she needed funds for the children's school clothing; one dwelling was too small and she moved in contemplation of her marriage to Lance; after Lance's arrest, she was requested to move; finally, she was compelled to transfer her children to the Gamble home for reasons of safety. Mrs. Lance testified that she received threats to her children after Lance's arrest; she was attacked by an intruder in her home while the children were present. She sought consultation with her caseworker, Mrs. Pearce, who approved the transfer of the children. Mrs. Pearce frequently

visited the Gamble home and expressed approval of the conditions therein. Mrs. Lance visited her children daily.

Mrs. Lance testified that her children had problems with their teeth and that she took them to the University Hospital for a checkup. She was informed that they needed dental care which she would have to procure from a private dentist. She contacted Welfare and was advised to select a private dentist, which she did; subsequently, she contacted her caseworker several times, requesting the necessary papers, which were promised but never received.

Mrs. Lance cited as an example of her diligence in procuring needed medical care the taking of her youngest daughter to University Hospital twice weekly for medical treatment of an infection from January 1966 to February 1967.

Mrs. Lance testified that she was in the State Mental Hospital from July 21 until August 21, 1967, and that she now felt more able to deal with her problems. At the time of the hearing, she testified that she was residing with her mother and had part-time employment as a baby sitter. She expressed a desire to make a home for her children.

The mother and sister of Mrs. Lance testified that she loved her children and read to them and always kept an adequate home.

Another factor of significance was the court's refusal to call Mrs. Pearce as a witness. She had frequently observed the children in their home with appellant, and she could have refuted much of appellant's testimony.

From the foregoing facts we must conclude that there is insufficient evidence to support the finding that appellant's behavior was *seriously detrimental* to her children. The only reference to Cody Peterson was a statement that he had resided with his grandmother and then his aunt.[4] There is no evidence specifically concerning RaNona Pilling. Mrs. McKay's comments about Inez Pilling are insufficient, particularly since she never worked with Inez personally. A careful assessment of the testimony about Donna Pilling does not reveal sufficient evidence to support a

---

4. See Diernfeld v. People, 137 Colo. 238, 323 P.2d 628, 631 (1958) wherein the court observed:

"* * * If through arrangements made by the parent, the child is being properly cared for by those who have a genuine interest in its welfare, the fact that the mother has obtained such help and has sought out and procured proper care for the child is evidence that the parent is not neglecting the child. It is also evidence of proper concern for the child's welfare and tends to establish that she was not abandoned or left homeless. * * * To be sure the state has an interest in the child, but its interest is based upon the statutory grounds of dependency, neglect or abandonment, and in order for the child to be snatched from a blood relation who is giving her love and care, there certainly must be some showing as to the necessity therefor."

finding that Donna's emotional problems were predominantly a result of her mother's behavior. Another factor which strongly militates against the judgment of the court is the total lack of evidence that Mrs. Lance was informed of the alleged inadequacies of the environment she was providing so that she might have an opportunity to improve these conditions. Since the species of her neglect involved rather subtle psychological factors—interference with the adequate social, educational, and psychological adjustment of her children—justice requires that she be informed of the condition and be advised of appropriate remedial action. There was not a scintilla of evidence that the home itself "cannot or will not correct the evils which exist." [5]

Appellant further asserts that the court in the process of rendering its judgment considered evidence that was not introduced at the hearing.

In Fronk v. State,[6] this court found an order of the Juvenile Court improper and unwarranted, where the findings had not been based on evidence adduced at its hearing.

The hearing in the instant action was held initially on September 27, 1967, and continued from that date until November 2, 1967, when it was concluded. However, the court did not render its written judgment until February 2, 1968. Included in the findings were facts that had not even occurred at the time of the last hearing, such as the trial and conviction of Mrs. Lance in December, 1967.

Appellant objects to the use of a social file by the court in making its determination. The file was not introduced into evidence and included such hearsay matters as newspaper clippings concerning Mrs. Lance and her arrest for allegedly committing a crime. Except for references to Mrs. Lance's examination at the State Mental Hospital and her statement that her bondsman granted her permission to go to Idaho to visit her son at her sister's home, there was no evidence that she had been accused of a crime.

Section 55–10–99, U.C.A., 1953, as amended 1965, provides:

The probation department or other agency designated by the court shall make a social study and report in writing in all children's cases in which a petition has been filed, * * *.

Section 55–10–96 of the 1965 Act permits "written reports and other material relating to the child's mental, physical and social history and condition" to be received in evidence and considered by the court along with other evidence.

Contained in the social file was a letter from Mary Brown to Judge Garff; she

---

5. State in Interest of F v. Dade, note 1, supra.

6. Note 2, supra.

cited as a reason for referral the fact that Mrs. Lance was awaiting trial for attempting to aid a prisoner to escape from the Utah State Prison, that Mrs. Lance was undergoing psychiatric treatment and evaluation and consequently her children were neglected. In her letter Miss Brown made numerous statements, based on hearsay, that were highly detrimental to Mrs. Lance. Subsequently, when Miss Brown testified, her testimony was of a substantially different type, including an admission that she had never talked with appellant personally. In Miss Brown's letter she stated:

Summary and Recommendations:

Throughout the case record there is a history of instability, stormy marriages, inadequate child care and no follow-through on medical care. Maxine [Donna] appears to be a self-centered person and has never considered the effect her behavior has had upon her children. It is our recommendation that she be deprived custody of the children and they be placed in a home where they can have security and parental guidance.

In McGuire v. McGuire,[7] the court was confronted with a Florida statute, which provided for a social investigation in any case where the custody of a minor child was in issue. The court ruled that when a written report is considered in connection with a ruling or judgment, it should be filed in evidence the same as any other writing the court may consider. It is error for a court to consider any writing or anything else that is not in evidence.

In the instant action, the use of the social file was a denial of due process of law, since appellant had no opportunity to know, cross-examine, explain or rebut this secret evidence.[8]

The judgment of the Juvenile Court is reversed and remanded for a new hearing.[9]

TUCKETT and HENRIOD, JJ., concur.

CROCKETT, C. J., and ELLETT, J., dissent.

7. Fla.App., 1962, 140 So.2d 354, 355, 356.
8. See Los Angeles & S. L. R. Co. v. Public Utilities Comm., 81 Utah 286, 297, 17 P.2d 287 (1932) ; 16 Am.Jur.2d, Constitutional Law, Sec. 578, p. 983, Sec. 579, pp. 984–985.
9. Appellant, as an additional point, complained of the inadequacy of the record on appeal due to numerous omissions and inaudibles in the transcript of the proceedings. It is the duty of the Juvenile Court to adhere to the standard prescribed in Sec. 55–10–109(c) (2), "A verbatim record of the proceedings must be taken * * *"; and we assume on rehearing an adequate record will be made.