STATE of Utah, In the Interest of A.H., 4–1–76, Division of Family Services, Department of Social Services, Plaintiff and Appellant,

v.

MR. AND MRS. H., Defendants and Respondents.

No. 19454.

Supreme Court of Utah.

Jan. 10, 1986.

Rehearing Denied March 21, 1986.

David L. Wilkinson, Atty. Gen., Linda Luinstra, Carlie Christensen, Salt Lake City, Michael Harrison, Provo, for plaintiff and appellant.

D. Gilbert Athay, Salt Lake City, Bruce Holliday, Monticello, for defendants and respondents.

DURHAM, Justice:

This is an appeal from a juvenile court order restoring custody of A.H., a minor, to defendants Mr. and Mrs. H., under the

continued protective supervision of the Utah State Department of Social Services, Division of Family Services ("DFS"). A prior order had taken custody of A.H. away from Mr. and Mrs. H., her prospective adoptive parents, and placed custody with DFS pending a hearing on a petition alleging mistreatment and neglect by Mrs. H.

Appellant DFS argues that the juvenile court incorrectly applied the statutory standard applicable to the termination of parental rights when it ordered that A.H. be returned to the custody of the prospective adoptive parents. DFS further argues that restoring custody of the child to the H.s was not in the best interests of the child. We agree.

A.H. was born in El Salvador in April of 1976. She came to the United States for adoptive placement when she was five years two months old. A.H. joined the H.s' two natural children and two adopted children in their southern Utah home in June 1981. After approximately six months of temporary custody, the H.s filed a petition for adoption of A.H. on January 5, 1982.

A.H. suffered from a variety of maladies when she arrived in the H.s' home, including intestinal parasites, scarring of the retinas caused by infection, alleged difficulty in swallowing and digesting foods, impaired motor coordination, and a congenital chest deformity. .

On April 16, 1982, A.H. was hospitalized, comatose, for a subdural hematoma (severe brain concussion) that threatened her life. Immediate surgery was required and performed. The admitting pediatrician, Dr. Piper, noted that in addition to the brain concussion, A.H. had multiple small bruises on the scalp in varied stages of healing, large bruises on her lower back and buttocks, a large bruise in her groin area, multiple bruises over her extremities, and severe lacerations on the tops of both feet. Dr. Piper suspected child abuse from the numerous bruises on her body. The surgeon agreed and reported that "whenever an acute subdural hematoma occurs in a child without adequate explanation it is almost always related to non-accidental trauma or abusive conduct." On May 17, 1982, A.H. was transferred to Primary Children's Medical Center in Salt Lake City for further testing and treatment. The evidence also indicates that since A.H. left the H.s' home she has improved, without incident or further injury, and has bonded well with her foster parents. Despite this progress, Dr. Nilsson, a clinical psychologist, doubted that she will ever function above a " 'mentally deficient' level" as a result of her injuries.

The H.s offered explanations to DFS for almost all of A.H.'s injuries. They said that A.H. fell while bathing and struck her head two weeks before the hospitalization, but that she had exhibited no signs of serious injury at the time. Two weeks later, Mrs. H. heard a thump, went into A.H.'s room, and found A.H. unconscious and not breathing. Mrs. H. began mouth-to-mouth resuscitation and called for an ambulance. The bruise to the groin was explained as resulting from a mishap on a swing glider that caused A.H. to straddle a bar incorrectly. The bruises to the back were explained as having occurred when A.H. tipped off of a tricycle backwards. The lacerations on the feet were said to have occurred when cement blocks supporting a teeter-totter fell on A.H.'s feet while she was playing with other children. The H.s also stated that A.H. had poor coordination, that she fell often, and that she bruised easily because of her prior medical history.

Despite these explanations, DFS filed a petition for protective custody on May 28, 1982, alleging that A.H. was a neglected child as defined in U.C.A., 1953, § 78–3a–2(17). The court awarded custody to DFS pending the determination of jurisdiction and ordered the H.s to pay for A.H.'s support during foster care. The court found jurisdiction based upon an admission of neglect by Mrs. H. At first, the court informed the parties that it would not accept an admission of neglect without the factual basis to support it. However, neither the State nor Mrs. H. offered any evidence in addition to the medical reports and other

materials already before the court. The court then reluctantly accepted the admission.

The court found that the causes of A.H.'s injuries were inaction on the part of Mrs. H., her failure to seek medical attention generally and particularly for the head injury sustained April 4, 1982, as well as failure to protect the child following the injury "with knowledge of the child's propensities to accidental [sic] and self-injury as a result of which the child sustained further injury to her head on April 16th resulting in subdural hematoma." The court concluded that the best interests of the child warranted continued temporary custody by DFS.

On June 8, 1983, DFS filed a petition alleging that further mistreatment and abuse had occurred during a visit with A.H. After a hearing, the court ordered that petition dismissed. On July 5, 1983, the H.s filed a petition for return of custody. Prior to a hearing on the petition, the court ordered psychological profiles of the H.s. The juvenile court held a hearing on the H.s' petition, and on August 23, 1983, the court issued its decision. The judge found that the psychological profile of the H.s "indicates that they have personality characteristics well within normal limits with no pathological characteristics present which would make them unfit parents to care for and raise ... [A.H.]." The court also found that A.H.'s special education needs could be met in San Juan County, and the court ordered the return of custody to the H.s. The State appealed that decision, and this Court granted a temporary stay pending the appeal.

■ Juvenile court determinations regarding the custody of children are equitable in nature, and this Court is charged with the responsibility of reviewing the evidence. *See Wilson v. Family Services Division*, Utah, 554 P.2d 227, 230 (1976). Ordinarily, we will not overturn the findings and decisions of the juvenile court "unless they are clearly against the weight of the evidence, or it is plainly manifest that the court has abused its discretion." *State ex rel. F.D.P. v. Dade*, 14 Utah 47, 51–52, 376 P.2d 948, 951 (1962). However, this Court has recognized that in equitable proceedings we must do our own weighing and make our own decision based on the facts in the record. *D.P. v. Social Service & Child Welfare Department*, 19 Utah 2d 311, 321, 431 P.2d 547, 553 (1967).

■ DFS argues on appeal that the H.s have no standing to petition the juvenile court for restoration of custody under U.C.A., 1953, § 78–3a–47. We disagree. That statute, formerly codified as U.C.A., 1953, § 55–10–108, "does not apply until there has been a *final* determination and decree of custody." *State ex rel. Tom v. Tom*, Utah, 556 P.2d 213, 215 (1976) (emphasis added). Prior to the H.s' petition for restoration of custody, the juvenile court in this case had not made a final determination and decree of custody. The court had merely placed temporary custody with DFS subject to further court order pending further development of the facts.

■ Traditional standing criteria require that the interests of the parties be adverse and that the party "seeking relief have a legally protectible interest in the controversy." *Kennecott Corp. v. Salt Lake County*, Utah, 702 P.2d 451, 454 (1985) (citation omitted). Although parents are the only persons with a legally *vested* interest in the custody of a child, *Wilson v. Family Services Division*, 554 P.2d at 229, a child's prospective adoptive parents do have a legally protectible interest. Although the H.s may not be legally entitled to permanent custody prior to finalization of an adoption petition, the actions of the juvenile court could effectively foreclose the possibility of adoption for them. Therefore, having filed a petition for the adoption of A.H. and having been ordered by the court to pay for her expenses, the H.s have a legal interest sufficient to confer standing to petition for restoration of custody. *Accord In re Joseph*, R.I., 420 A.2d 85, 89 (1980) (prospective adoptive parents have standing since removal of child could result in "injury in fact").

■ The next issue is whether the juvenile court erred in determining the issue of A.H.'s custody utilizing the standards for termination of parental rights. The termination of parental rights is a drastic measure that should be resorted to only in extreme cases, when it is clear that the home is unable or unwilling to correct the evils that exist. *State ex rel. Pilling v. Lance*, 23 Utah 2d 407, 409, 464 P.2d 395, 397 (1970). "There is a presumption that it is generally for the best interest and welfare of children to be reared under the care of their natural parents." *Id.* at 410, 464 P.2d at 397. The termination of parental rights is not permitted solely upon a finding of the best interests of the child without a finding of parental unfitness, abandonment, or substantial neglect. *In re J.P.*, Utah, 648 P.2d 1364, 1374–77 (1982). Section 78–3a–48 of the Utah Code requires compliance with those standards in order to protect parents' constitutional rights to raise their own children. *See In re J.P.*, 648 P.2d at 1377–78. In addition, due process concerns require the state to prove allegations by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 768–69, 102 S.Ct. 1388, 1402–03, 71 L.Ed.2d 599 (1982).

The juvenile court's findings of fact and order in this matter indicate that the court incorrectly applied a standard which has application only to proceedings for the termination of parental rights. The court carefully examined the evidence and testimony for unfitness, incompetency, or substantial continuous neglect. The findings of fact in the order returning custody directly refer to the fitness and competence of the H.s. In addition, the court found that the "neglect of [A.H.] ... did not justify *permanent termination of their parental rights.*" (Emphasis added.)

■ The rules governing the termination of parental rights, however, are not applicable here since the H.s are the prospective adoptive parents and not the legal parents of A.H. No statute provides guidance in defining the standard to be applied to deprive prospective adoptive parents of custody of a prospective adoptive child. We must rely, rather, on equitable principles and a concern for the best interests and welfare of the child. *See In re J.P.*, 648 P.2d at 1377. *See also* U.C.A., 1953, § 78–3a–39(12) ("In placing a child under the guardianship or legal custody of an individual ... the court shall give primary consideration to the welfare of the child...."). To protect the investments in time, affection, and money by prospective adoptive parents, we hold that returning custody to prospective adoptive parents may be prevented only upon a showing of good cause and a finding that denial of custody is in the best interests of the child.

We believe the evidence in this case meets the foregoing requirement. Mrs. H. has admitted to neglecting A.H. The findings of the juvenile court establish conclusively that the cause of A.H.'s injuries was the neglect and inaction of the persons responsible for her care. There is no conflict in the evidence contained in the numerous, detailed, and lengthy medical reports, illustrated by contemporaneous photographs, of the condition of A.H. when she was admitted for emergency medical treatment. There is no conflict in the evidence which establishes that because of the injuries sustained by this child as a result of the neglect of her caretakers, A.H. is permanently and severely impaired (far beyond the handicaps she had upon her arrival in the H. home) in her intellectual capacity and physical development. The surgeon in Colorado, after detailing the appearance and extent of A.H.'s injuries, exclusive of the head injury for which she was admitted for treatment, wrote: "I have absolutely no reservation about calling these wounds severely traumatic, repeated in multiple [sic] and probably occurring over a long time chronologically." All of the other medical and physical evidence in the record substantiates that description. Even accepting as absolutely accurate the explanations offered by Mr. and Mrs. H. for each and every one of these numerous, severe, and painful injuries, we are unable to identify any acceptable explanation for the fact that able, intelligent people would permit

the occurrence of such massive damage as that which was visible on the person of A.H. at the time of her hospital admission. The absence of reasonable explanation is underscored by the fact, clearly demonstrated in the record, that A.H., despite her now much exacerbated disabilities, has thrived and has suffered no similar injuries in the care of her foster parents during this litigation.

■ We believe that the evidence in this case showed good cause and that it was in the best interest of A.H. to deny the petition to return custody of A.H. to the H.s at the time of the hearing on the petition. The time, effort, and money invested by the H.s as prospective adoptive parents, while substantial, are not sufficient to outweigh the need to protect the best interests of A.H.

The order of the juvenile court is reversed, with temporary custody of A.H. to remain with DFS pending further proceedings.[1] No costs awarded.

HALL, C.J., and ZIMMERMAN, J., concur.

HOWE, Justice (dissenting):

I agree that the juvenile court judge may have unnecessarily considered "parental rights" when he concluded that the "neglect of [A.H.] in the [H.] home did not justify permanent termination of their parental rights." In his defense, however, I note that the DFS in its amended petition sought the termination of all "parental rights to said child including residual parental rights." Thus the court in its ruling was simply responding to the amended petition which was before him. As will be seen below, any error in this regard was not prejudicial.

I dissent from the holding of the majority that the evidence compels the continued deprivation of custody of A.H. by the H.s. In reversing the juvenile judge, the majority violates our standard of review which accords to the juvenile judge wide latitude in finding the facts and drawing reasonable inferences therefrom.

The majority places great significance on Mrs. H.'s admission to the neglect charge. Some background information will be helpful to understand her reasons for doing so. At the time the admission was made, A.H. had been away from the H.s for nearly a year. The expense of traveling 800 miles round trip to visit her more than once a month was beginning to tax the resources of the H. household. Support payments for A.H. in foster care were required. Attorney fees were mounting, and the H.s' attorney told them that they would have to pay a $5,000 retainer to go to trial. At one point, the county attorney, who was representing the DFS, told the H.s that their decision to fight the allegations was only delaying the case and that if they would cooperate and allow the state to have custody, A.H. would be returned to the H. home within three months. The agreement among the parties at a pretrial hearing is of great procedural importance in this case:

THE COURT: Okay. Before accepting any admission, though, I want it clearly understood that the—under the law of neglect, of course, there are various degrees of neglect, going all the way from a borderline situation, that is censurable, but not sufficient to justify the State or the Court in severely interferring [sic] with custodial rights or severely interferring [sic] with the free agency of the parents and the child regarding their association, all the way to very aggravated kinds of neglect, which, in the interests of the child and for the protection of the child, justify the Court in taking extensive measures. Now, this

---

1. It is appropriate here to observe that at such time as the H.s' pending petition for adoption is heard and A.H.'s permanent custody is determined, the district court is required by U.C.A., 1953, § 78-30-9 to be "satisfied that the interests of the child will be promoted by the adoption." DFS will at that time, pursuant to section 78-30-14, make an investigation of the child and prospective adoptive parents and report its findings, with its recommendation, to the court. This procedure assures that A.H.'s best interests will be examined and determined before her permanent custody is fixed.

is not a case where there is a contention that the rights of the [H.s] with regard to this child be permanently terminated; but if the Court is to accept an admission on this matter, ... [*and*] *the Court wants it clear on the record and to all concerned, that the Court must treat the case as one where substantial deprivation of their rights would not be justified over an extended period of time,* providing, and the Court's in agreement with your understanding, providing that measures be taken that satisfy the State and Social Services, that the [H.s] are trying to rectify the circumstances that may have led to the situation that came to the Court's attention initially.

Now, is there any question in that regard, Mr. Halliday? [the county attorney]

MR. HALLIDAY: No.

(Emphasis added.) After some discussion off the record and a conference with personnel from the DFS, the county attorney decided to proceed to trial instead of accepting an admission. At that same January 1983 pretrial conference, the judge told the DFS that the medical reports failed to indicate that the doctors were fully informed of A.H.'s history and of the H.s' explanations of her injuries, and whether the injuries could not have occurred as the H.s had explained. Instead of going back during the intervening two months before the scheduled trial and remedying the deficiencies, the DFS decided just prior to the scheduled trial that it would accept an admission of neglect. The judge reminded the DFS of his position to allow only a temporary deprivation of the H.s' rights, to which the county attorney consented. With this knowledge, the DFS agreed and accepted the admission of neglect.

Although the H.s consistently and strongly maintained that the allegations in the petition were untrue, in an effort to shorten the proceedings, Mrs. H. finally admitted that she could have watched A.H. more closely and taken extra measures to protect her from injury. The judge personally made his findings, covering seven full pages, and carefully explained his reasoning. Significantly, he found that the doctors' reports cited by the majority "failed to disclose the results of any investigation other than medical examination of the child, if one was made, concerning explanations offered by Mr. and Mrs. [H.] that would tend to support or discredit them" and that no "evidence even slightly impugned their version of the history of the child in their care and their description of her condition, prior treatments, propensities, behaviors and accidents." Although the court's order clearly provided and the findings contemplated that A.H. would be returned to the H. home, and although the court denied the DFS its request for a permanent deprivation of custody, the DFS chose not to appeal from that order. However, even if the DFS's appeal were from that order, we should not overturn the juvenile court's well-reasoned findings. The court was in a better position to weigh the evidence than we are able to do from the cold record.

The majority claims that there is:

no conflict in the evidence which establishes that because of the injuries sustained by this child as a result of the neglect of her caretakers, A.H. is permanently and severely impaired (far beyond the handicaps she had upon her arrival in the H. home) in her intellectual capacity and physical development.

This statement misrepresents the record. Although A.H. suffered many injuries and diseases, nothing in the record completes the causal link to establish that her disabilities are now "greatly exacerbated" as a result of Mrs. H.'s negligence or A.H.'s stay in the H. home. Particularly, the doctors' reports fail to distinguish between A.H.'s disabilities when she arrived in the H. home and when she was taken by the DFS. They do not indicate how the efforts of the H.s to help A.H. were negligent or were the cause of her disabilities. The medical evaluations were, for the most part, written in very general terms with qualifying statements indicating that the doctors did not have full information. None of the doctors indicated that A.H. had

any "exacerbated disabilities" because of any negligence on the part of Mrs. H. This was never argued to the juvenile court, and that court made no finding that A.H.'s disabilities were in any way "exacerbated" as a result of anyone's actions. Significantly, the medical staff at the hospital in Grand Junction, Colorado, where A.H. was treated for brain concussion, initially suspected abuse. Yet after conducting an investigation and apprising itself of the facts, it decided that although A.H.'s injuries were severe, there were no grounds to bring charges of abuse.

In light of A.H.'s diseased condition when she arrived in the H. home and Mrs. H.'s efforts to help her, the juvenile court committed no error in finding that Mrs. H.'s negligence did not justify keeping A.H. out of the home any longer than the sixteen months she had been kept in the protective custody of the DFS. At 5½ years of age, A.H. weighed just 31 pounds upon placement in the H. home. Her numerous maladies were of the type that, if not properly treated, can cause serious physical and mental deficiencies, even death. Immediately after A.H. arrived, Mrs. H. arranged to have A.H. examined by the local doctor in their small town. His treatments, which lasted over three months, for A.H.'s parasites failed to eradicate the numerous parasites that were eating away her body and robbing her of life-sustaining nutrients. During these months, Mrs. H. repeatedly inquired about giving A.H. high calorie food supplements, but the doctor told her that it was not necessary. During these same three months, A.H.'s weight dropped to 27 pounds. We can only speculate as to the magnitude of harm that these delays had on A.H.'s physical and mental disabilities and development.

When the medical treatments proved unsuccessful in eradicating the parasites, Mrs. H. demonstrated her diligence in caring for A.H. by independently sending stool samples to Salt Lake City for evaluation and seeking more specialized treatment at Primary Children's Hospital. If not for this further treatment, A.H. may well have died of complications attributable to the parasites. Mrs. H. also independently began feeding A.H. high calorie food supplements in addition to her regular three meals a day. Under this care, A.H.'s weight increased to 39 pounds.

Throughout the years that A.H. was in the H. home, Mrs. H. continually expressed to both her local doctor and medical personnel at Primary Children's Hospital her concern about A.H.'s learning disabilities, difficulty in swallowing food, lethargy, lack of protective reflexes (especially when falling), glazed eyes, and dragging right leg. As late as two weeks before A.H. was hospitalized in Grand Junction, Colorado, Mrs. H. expressed concern to her local doctor regarding A.H.'s lethargy, glazed eyes, and dragging leg. She was told to not worry about them. Mr. and Mrs. H. made specific plans to relocate closer to Primary Children's Hospital so that A.H. could receive specialized medical attention and training. Mrs. H.'s continued, diligent efforts to provide proper medical attention and therapy to A.H. demonstrate that any negligence on her part did not rise to the level which would justify this Court mandating that the H.s continue to be deprived of A.H.'s custody, even under the majority's "good cause/best interests of the child" standard. Perhaps the H.'s could have provided better medical attention for A.H. if they had not lived in a small, remote town.

After the March 1983 hearing at which the court found jurisdiction, the court was faced with some widely conflicting evidence. The court wisely ordered that temporary custody remain with the DFS until an independent psychological evaluation could be performed on the H.s. This was agreeable to the DFS. However, the DFS changed its position when the psychological evaluations were favorable to the H.s. As part of the court's established plan to allow only a temporary deprivation of custody, it ordered the DFS to formulate a treatment plan whereby both A.H. and the H. family could receive counseling prior to A.H.'s return to her home.

The record is barren of any indication that the DFS developed or submitted a treatment plan to the juvenile court in the months following the March hearing. After a June 21, 1983, petition was filed by the H.s for A.H.'s return, the court held an evidentiary hearing on the petition. Upon taking evidence and after reviewing the court-appointed psychologist's evaluation, as well as a report from a licensed marriage and family counselor who had counseled with the H. family, the judge determined that A.H. should be returned to her home under the protective supervision of the DFS.

Although the evidence was extremely conflicting, the DFS had the burden of showing that continued deprivation of custody by the H.s was both in the best interest of A.H. and that there was good cause to do so. The majority incorrectly holds that as a matter of law that burden was met; the majority impermissibly requires that the H.s carry the burden to convince this Court that their explanations are acceptable. In so doing, it fails to give any weight to the juvenile court's proximity to the evidence and the witnesses and his thoughtful findings and conclusions. Even though the DFS inveighs against the order returning A.H. to the H. home, it does not contend on this appeal that on the conflicting evidence presented to the court, his findings do not find support therein.

Finding no abuse of discretion, I would affirm.

STEWART, J., concurs in the dissenting opinion of HOWE, J.