In the Interest of Minors J.C.O., aka J.C.A., and E.J.O., aka E.J.A.,

v.

Paul ANDERSON and Marjorie Anderson, Defendants and Appellants.

No. 20464.

Supreme Court of Utah.

Feb. 18, 1987.

Nathan D. Hult, Logan, for appellant.

David L. Wilkinson, Atty. Gen., Diane Wilkins, Asst. Atty. Gen., Salt Lake City, L. Brent Hoggan, Logan, for guardians.

DURHAM, Justice:

Paul and Marjorie Anderson (the Andersons) appeal from a decision of the First District Juvenile Court terminating their parental rights in the children J.C.O. and E.J.A. We affirm.

The Andersons raise three issues on appeal: whether the evidence was sufficient to support a termination of parental rights; whether the State met its alleged duty to provide treatment and assistance; and whether the juvenile court had jurisdiction.

## FACTS

The record reveals the following facts supporting the findings of the trial judge. Paul Anderson purportedly married Marjorie Olsen in September 1979 in a ceremony performed without benefit of a license by a "minister" of a polygamist church with which Paul and Marjorie were involved. At the time of the "marriage," Paul was legally married to Gilda Anderson, by whom he had a son and a daughter, and Marjorie was married to Wayne Jagi. Gilda Anderson divorced Paul on April 15, 1980. In November 1979, Marjorie was divorced from Wayne Jagi, who was awarded custody of their daughter. Paul's daughter by Gilda died of sudden infant death syndrome prior to their divorce. Gilda testified that she called Paul from the hospital on the night of his daughter's death and Paul told her the death was her fault. Paul did not attend his daughter's funeral and did not pay any of her funeral expenses. Paul has paid no child support for his son by Gilda, although ordered to do so by the district court, nor has he visited the child.

J.C.O. was born in Salt Lake City on March 10, 1980; he was about three months premature. The space for the father's name on J.C.O.'s birth certificate was left blank, and Olsen was listed as his surname. Paul, Marjorie, and J.C.O. moved to Logan in April 1980.

When J.C.O. was about five months old, the Division of Family Services was informed that Paul and Marjorie, who was five months pregnant, were leaving J.C.O. unattended in their apartment for long periods. The Division of Family Services offered its services, including day care and medical treatment, to Paul and Marjorie, who never used the proffered services.

In January 1981, Marjorie telephoned the Ogden Family Support Center and asked them to pick up J.C.O. A worker from the Center picked up the child and took him to a hospital. The child was ill and covered with bruises. The State's expert witnesses testified that J.C.O. had been abused. Marjorie had on previous occasions contacted the Ogden Family Support Center concerning J.C.O.; she admitted that she had called the Center previously, but had always refused to leave her name, citing fear of prosecution for child abuse.

During the early part of 1981, the Andersons attended a Baptist church in Logan where they presented themselves as husband and wife. At the church, they met Linda and Gary Gilgen. Mrs. Gilgen helped Marjorie with errands, drove her to the doctor, and volunteered to take J.C.O. into the Gilgen home while Marjorie gave birth. On February 9, 1981, J.C.O. was left in the Gilgens' care. The Gilgens were provided with two blankets, two pairs of socks, two undershirts, and some disposable diapers. J.C.O. was in poor condition when left with the Gilgens: although he was eleven months old, he weighed less than fifteen pounds; he was unable to sit up or roll over; he would scream uncontrollably when anyone touched his head or attempted to bathe him; and he suffered from severe diaper rash.

E.J.A. was born on February 10, 1981. On his birth certificate, his parents were listed as Marjorie Olsen and Paul Anderson. Seventeen days after his birth, E.J.A. was left with Eric and Katherine Larsen, friends of the Gilgens and members of the same Baptist church. E.J.A. was also in poor condition: his umbilical cord was still attached and he was covered in birth wax, he was unable to suck, and he had an extreme fear of falling. After E.J.A.'s birth, Marjorie was placed in a psychiatric ward.

J.C.O. and E.J.A. thrived under the care of the Gilgens and the Larsens. J.C.O. became less fearful and gained weight; in thirty days, he went from the third weight percentile for children his age to the forty-fifth. E.J.A. made similar progress. The Andersons had only minimal contact with the children, the Larsens, and the Gilgens. Paul, without inquiring about J.C.O.'s welfare, delivered some diapers to the Gilgens shortly after the child was left with them.

The Gilgens and the Larsens, through the Division of Family Services, became temporary foster parents on February 27, 1981. The arrangement was to last forty-five days, but was extended to sixty days. At the end of sixty days, the Andersons did not retrieve the children. Neither of the Andersons visited the children at home from March 16, 1981, until August 1981. The only contacts the Andersons had with the children during this period were casual meetings at church. The Andersons moved to Salt Lake City, but did not inform the Gilgens or the Larsens of their new address.

In August, the Gilgens and the Larsens, with the Andersons' consent, were appointed legal guardians of the children. Late in August, E.J.A. was taken for a visit with Marjorie. In September, the Andersons had some casual contacts with the Larsens, but did not inquire about E.J.A. The Andersons provided no Christmas gifts for the children in 1981, although they did call on Christmas Day to arrange a January 2 visit with the children, which they failed to attend. The Andersons consistently failed to keep appointments to visit the children, claiming, among other things, that the price of gas was prohibitive; they never-

theless rejected the Gilgens' offer of money for transportation.

In early 1982, the Gilgens learned that J.C.O. had cerebral palsy. Mrs. Gilgen works with J.C.O. on special exercises to increase his muscle control and expends considerable time and effort in transporting him to medical facilities. When Paul was informed that J.C.O. had cerebral palsy, he replied that he was not concerned because J.C.O. was a "tough kid." The State submitted expert testimony indicating that J.C.O.'s cerebral palsy could have been caused by the beatings J.C.O. suffered while in the Andersons' care.

In February 1982, the Andersons expressed some interest in obtaining the children. They set up and then failed to attend a number of meetings with the Gilgens and the Larsens concerning the retrieval of the children. The Gilgens and the Larsens contacted the Division of Family Services, who sent its personnel to meet with the Andersons seven times between April and September of 1982, attempting to work out an arrangement for the return of the children. The Division's efforts were unsuccessful.

In September 1982, the Andersons went to Florida without informing the Gilgens, the Larsens, or the Division of Family Services that they were leaving or how they could be contacted. The Gilgens and the Larsens filed petitions for adoption in First Judicial District Court in October 1982; diligent efforts to notify the Andersons of the adoption proceedings proved unsuccessful. However, when the Andersons learned of the adoption proceedings through a church associate, they returned to Utah to oppose the adoption.

In December 1982, the Division of Family Services filed this action to terminate the Andersons' parental rights in order to facilitate the adoption of the children. The Gilgens and the Larsens were allowed to intervene in the action as the children's guardians.

---

1. This case was tried in October 1984, after this Court had declared unconstitutional the 1980 and 1981 amendments to section 78–3a–48 but before the 1985 amendment, which gave the

## SUFFICIENCY OF THE EVIDENCE

Utah Code Ann., 1953, § 78–3a–48 allows the State to terminate parental rights under certain enumerated circumstances. Section 78–3a–48, as constituted at the time of trial,[1] provided:

(1) The court may decree a termination of all parental rights with respect to one or both parents if the court finds:

(a) That the parent or parents are unfit or incompetent by reason of conduct or condition seriously detrimental to the child; or

(b) That the parent or parents have abandoned the child. It shall be prima facie evidence of abandonment that the parent or parents, although having legal custody of the child, have surrendered physical custody of the child, and for a period of six months following such surrender have not manifested to the child or to the person having the physical custody of the child a firm intention to resume physical custody or to make arrangements for the care of the child....

■ The State must prove the parent's unfitness or abandonment by clear and convincing evidence. *In re J.P.*, 648 P.2d 1364, 1377 (Utah 1982); *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). We have reviewed the record and agree with the trial court that the State proved by clear and convincing evidence that the Andersons were unfit or incompetent and had abandoned the children. In opposition to the evidence set forth above, the Andersons proffered testimony that the Gilgens and the Larsens had not fully cooperated in allowing them to see the children and that the Andersons always desired custody of the children. The trial court's ruling against them is amply supported by the record.

We agree with the trial court that J.C.O. and E.J.A. were abandoned. In *In re J. Children*, 664 P.2d 1158 (Utah 1983), we set forth the standard of review in aban-

section its present form. *See In re J.P.*, 648 P.2d 1364 (Utah 1982). Thus, the statute in force at the time of the trial was the pre–1980 amendment version.

**462**

donment cases and the definition of "abandonment." We stated:

> In relation to this subject [abandonment], the "clear and convincing" test concerns both evidentiary support for a finding of fact and the level of persuasion on the reasonableness of a conclusion. . . .

Our scope of review of a "reasonableness" determination such as this was defined in *Hall v. Anderson*, Utah, 562 P.2d 1250, 1251 (1977), quoted with approval in *McKinstray v. McKinstray*, 628 P.2d [1286] at 1288, as follows:

> [I]f evidence is such that reasonable minds may differ as to the conclusion to be drawn therefrom, it is the prerogative of the trier of facts to make the determination; and this Court should not interfere with that prerogative by disagreeing with the determination thus made.

*Id.* at 1161.

■ In *In re J. Children*, we defined "abandonment" as "conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship." *Id.* at 1159 (citing *Summers Children v. Wulffenstein*, 560 P.2d 331, 334 (Utah 1977)). Abandonment may be proven by either objective evidence of the parent's conduct or by the expressed, subjective intent of the parent. *Id.* at 1159. This definition of abandonment is supplemented by U.C.A., 1953, § 78–3a–48(1)(b), which states that it is prima facie evidence of abandonment that a parent with legal custody surrenders physical custody of the child for six months without manifesting a firm intention to resume custody or make arrangements for the care of the child.

■ The trial court was well within its prerogative in determining that J.C.O. and E.J.A. were abandoned. E.J.A. was in the Andersons' care only seventeen days before he was placed with the Larsens. The Andersons have never provided financially for the needs of either child, nor have they taken anything but the most superficial interest in the children's welfare. In short, there is no evidence upon which the trial judge could rely, except the Andersons' assertions that they have not abandoned the children, in holding that the prima facie evidence of abandonment had been rebutted; further, the evidence, unaided by the presumption, indicates that the Andersons had so consciously disregarded the children that any existing or potential parent-child relationship was destroyed by their behavior.

■ The trial court's finding that the Andersons were unfit or incompetent is also amply supported by the record. The record indicates that J.C.O. was severely abused and neglected while in the Andersons' care; E.J.A. was clearly neglected during the seventeen days he spent under Marjorie's supervision.

Further, the Andersons have at no time relevant to this proceeding maintained a stable home. They changed residences eighteen times between June 1980 and the trial of this action in October 1984. Paul has held innumerable jobs. Marjorie has been only randomly employed. Although at one point the pair claimed to have an income of over $2,000 a month, they have not paid anything toward the support of the children. The Andersons have been convicted of a number of criminal offenses, including welfare fraud. The fraud conviction was based on representations that J.C.O. and E.J.A. were living in the Andersons' home after the children had been placed with the Gilgens and the Larsens. Paul was in jail at the time of trial. An expert witness for the State testified that the Andersons are incapable of developing acceptable parenting skills. An expert witness presented by the State testified that Paul is a sociopath.

### THE STATE'S DUTY TO PROVIDE ASSISTANCE

The Andersons allege that it was improper for the State to have terminated their parental rights in J.C.O. and E.J.A. without advising them of their parenting deficiencies and attempting to rehabilitate them as parents.

As support for their claim that the State must advise parents of deficiencies before it can terminate their rights, the Andersons rely on *State v. Lance*, 23 Utah 2d 407, 464 P.2d 395 (1970). In *Lance*, this Court overturned a termination order because the evidence connecting the children's problems with the parental behavior did not demonstrate that the behavior was seriously detrimental to the children. 23 Utah 2d at 412, 464 P.2d at 398. In the course of that opinion, the Court stated:

> Another factor which strongly militates against the judgment of the court is the total lack of evidence that Mrs. Lance was informed of the alleged inadequacies of the environment she was providing so that she might have an opportunity to improve these conditions. *Since the species of her neglect involved rather subtle psychological factors—interference with the adequate social, educational, and psychological adjustment of her children* —justice requires that she be informed of the condition and be advised of appropriate remedial action.

23 Utah 2d at 413, 464 P.2d at 399 (emphasis added).

■ The foregoing comment in *Lance* was dicta and does not, by its own terms, apply when children are physically endangered by abuse or neglect. Furthermore, any notification of deficiencies, if and when required, need not be formal. We note that in the course of negotiations with the Gilgens, the Larsens, and the Division of Family Services, the Andersons were provided with a detailed list of problems in need of correction before the children could be returned to them.

■ The Andersons also contend that the State cannot terminate their parental rights without attempting to rehabilitate them as parents. The Andersons do not identify the source of this duty in Utah law, beyond citing dictum from *Interest of Walter B.*, 577 P.2d 119, 124 (Utah 1978), and alluding to the administrative procedures of the Division of Family Services. Nor do they comment on the scope of the duty or what methods may be employed to fulfill it. We do not, however, need to reach these issues because there is ample evidence in the record indicating that the Andersons were offered the services of the Division of Family Services, including parenting classes, medical care, protective day, care and assistance in obtaining employment and public assistance, but did not avail themselves of any of the services. Neither did they heed the counseling provided them by their pastor or use the special nutritional counseling available through the Women Infants and Children Program, although those services were also proffered. They moved at least twice without informing the Division of Family Services, the Gilgens, or the Larsens of their whereabouts, and they made only the most minimal efforts at preparing themselves to parent: they were legally married, they reformed the boys' birth certificates, and they attended one parenting class. We think that whatever duty the State may have to rehabilitate parents was satisfied in this case, and we note that rehabilitation ⸱ is an effort that requires commitment on the part of the parents, as well as the availability of services from the State.

## JURISDICTION OF THE JUVENILE COURT

■ Counsel for the Andersons has, in the spirit of *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 *reh'g denied*, 388 U.S. 924, 87 S.Ct. 2094, 18 L.Ed.2d 1377 (1967), and *State v. Clayton*, 639 P.2d 168 (Utah 1981), incorporated into his brief a document prepared pro se by the Andersons, entitled "Motion to Vacate Orders and Decision Including Findings of Fact, Conclusions of Law, and Decree." Insofar as we can discern, the argument asserted in that document is that the juvenile court lacked jurisdiction to terminate the Andersons' parental rights. The essence of the argument is that because the children's guardians filed an adoption petition in district court, the juvenile court did not have jurisdiction to terminate parental interests in the children. The Andersons have raised this assertion in both the district and the juvenile courts. The judges of

those courts held, as we do, that the argument is without merit.

Utah Code Ann., 1953, § 78–3a–16(1)(f) (Supp.1986),[2] vests the juvenile court with original exclusive jurisdiction to terminate the legal relationship between a parent and a child. The district court has jurisdiction to adjudicate adoption petitions. In this case, the district court judge before whom the adoption petition was pending properly ascertained that he had jurisdiction over the adoption petition but deferred to the juvenile court the termination of the Andersons' parental rights.

The Andersons also assert that the juvenile court was without jurisdiction because no preliminary inquiry was made before the juvenile court assumed jurisdiction. *See* U.C.A., 1953, § 78–3a–22 (outlining the procedures by which the juvenile court can take jurisdiction). That contention is contradicted by the record, which contains a report of a probation officer and a request for the juvenile court to assume jurisdiction.

Affirmed.

HALL, C.J., STEWART, A.C.J., and HOWE and ZIMMERMAN, JJ., concur.

---

**2.** At the time of trial, present section 78–3a– 16(1)(f) was codified at section 78–3a–16(5).