808 P.2d 1131 (1991)
STATE of Utah, in the Interest of J.C., A person under 18 years of age,
v.
Juanita CRUZ, Appellant.
No. 900162-CA.
Court of Appeals of Utah.
April 2, 1991.
*1132 Kim Rilling (argued), Rilling & Associates, Salt Lake City, for appellant.
R. Paul Van Dam, State Atty. Gen., Linda Luinstra, Carol Verdoia (argued), Asst. Atty. Gen., for appellee.
Ann Wassermann (argued), Salt Lake City, for Guardian Ad Litem.
Before BENCH, GREENWOOD and ORME, JJ.

OPINION
GREENWOOD, Judge:
Appellant Juanita Cruz, the natural mother of J.C., appeals the termination of her parental rights in J.C. based upon abandonment, Utah Code Ann. § 78-3a-48(1)(b) (1987).[1] We affirm.

FACTS
J.C. was born on December 8, 1979, and suffers from mental retardation and impaired hearing. He has been under the *1133 care of the Utah Division of Family Services (DFS), and in various placements arranged by that agency, since 1984. The State's petition to terminate appellant's parental rights in J.C. on the basis of abandonment was filed in November 1989 and heard in the juvenile court in January 1990.
The State's witness at the termination hearing was Cathy Haderlie, a DFS social worker who, at the time of the hearing, had been J.C.'s caseworker for nearly two years. Much of Ms. Haderlie's testimony concerned events that occurred before she became J.C.'s caseworker, and was based upon her review of the DFS file on J.C. that had been maintained since 1984. Appellant's timely and continuing hearsay objection to that portion of Ms. Haderlie's testimony was overruled under the business records exception to the hearsay rule, Rule 803(6), Utah Rules of Evidence.
From her review of J.C.'s file, Ms. Haderlie testified as follows: Appellant had placed J.C. in a private care center when he was two years old. In 1984, when J.C. was four, appellant voluntarily placed him in DFS custody. In 1986 and 1987, J.C. had a number of visits with appellant. During these visits, appellant displayed an inability to deal with the special needs related to J.C.'s handicaps. J.C. was hearing-impaired and mentally retarded. DFS observers reported no evident mother-child bonding during these visits. Additionally, J.C. manifested an unwillingness to visit his mother, and behavior problems associated with his handicaps would worsen following the visits.[2]
According to Ms. Haderlie, the DFS file also showed that some visits between J.C. and appellant were ended early at appellant's request, some scheduled visits were cancelled by appellant, and some offered visits were refused by appellant. Finally, Ms. Haderlie testified that the court file reflected appellant's noncompliance with several treatment plans developed by DFS in 1986 and 1987, at least two of which had been ordered by the juvenile court. Those plans were designed to reunite J.C. with appellant, and included efforts to teach appellant sign language so that she would be able to communicate with J.C.
The DFS file itself was never offered into evidence. However, a written summary of the file, prepared by Ms. Haderlie for the hearing, was offered. Appellant's sole objection to admission of the summary related to a statement in the summary that was not relevant to the issue of abandonment. This statement was stricken, whereupon appellant's counsel indicated that she had no further objection, and the summary was admitted into evidence. The summary essentially repeated Ms. Haderlie's testimony; it also indicated that appellant had not seen J.C. since May 1987, and that appellant had moved in September 1987, refusing to give DFS her new address.
Because she had been J.C.'s caseworker for nearly two years, a substantial portion of Ms. Haderlie's testimony was based upon her personal knowledge. She testified that during her tenure as J.C.'s caseworker, appellant had no contact with J.C., had not sent him Christmas or birthday presents, and had not provided any financial support for J.C.'s care. Ms. Haderlie testified that she had no contact from appellant regarding J.C. until April 1989, when appellant telephoned her. Appellant explained that she was calling because her motheri.e., J.C.'s grandmothersuggested that she do so. This explanation was given in response to Ms. Haderlie's question as to why appellant had not called about J.C. during the prior eighteen months. Appellant asked if J.C. was ten years old, and Ms. Haderlie informed her that he had recently turned nine.
During the April 1989 call, appellant also asked if she could visit J.C. Ms. Haderlie explained that this would not be a good time to visit him, because he had just been placed in a new foster home and was going through an adjustment period. According to Ms. Haderlie, appellant did not, then or later, insist on visiting J.C. In fact, Ms. *1134 Haderlie's only subsequent contacts from appellant came in May 1989, when appellant asked for and was provided with the name of an attorney to assist her, and in November 1989, when she called again, angry about being served with the termination petition and summons. Ms. Haderlie denied any effort on her part to avoid communicating with appellant, including any deliberate failure to return appellant's calls.
Ms. Haderlie also testified that she would recommend termination of appellant's rights in J.C. based solely on her knowledge gained during nearly two years as J.C.'s caseworker. She opined that appellant's lack of involvement with J.C. was a substantial departure not only from general community norms, but also from her observations of other parents whose children were in DFS custody. Ms. Haderlie asserted that there was no parent-child relationship between J.C. and appellant, but admitted that she had never personally observed the two together.
Finally, Ms. Haderlie testified that any permanent caretaker of J.C. would need to be competent in sign language and behavior modification techniques because of J.C.'s hearing and mental handicaps. She indicated that J.C.'s foster parents possessed these skills and had a strong desire to adopt J.C. According to Ms. Haderlie, J.C.'s language skills had greatly improved, and his behavior problems had greatly diminished, under the foster parents' care.
Appellant testified on her own behalf. Her testimony was often rambling and confused. The gist of appellant's testimony was that she had not willfully failed to contact her son, but that her attempts to contact him had been rebuffed by DFS. She testified that she had originally consented to J.C.'s placement out of her home "`cause they wanted him." She asserted that she had not sent cards or presents to J.C. because DFS had refused to tell her his whereabouts. Appellant claimed that she had tried "a lot" of times to reach Ms. Haderlie to inquire about her son before the April 1989 phone call. She claimed to have called for Ms. Haderlie at DFS "about five or more" times after the May 1989 contact, only to be told that Ms. Haderlie was not in the office.
On direct examination, appellant promised that she would do whatever was necessary to care for J.C. if her parental rights were preserved, and attempted to explain her lack of success with the previous court-ordered treatment plans: "[W]hat I wanted, I never denied none of these treatment plans, you know I wanted to do them and stuff, but then ladies come, you know, and then start fading away."
Appellant also testified that she had been studying sign language. She produced a book that she had purchased in connection with that course of study, and testified that she had learned "quite a bit" of sign language. However, when asked to demonstrate her skill, appellant could not produce any of three simple, child care-related questions or commands in sign language.[3] Moreover, she did not volunteer any demonstration of signing ability.
The juvenile court determined that the evidence presented at the hearing was clear and convincing. It found that appellant had not contacted J.C. since May 1987, and that appellant had "failed to provide any suitable reason" for that two and one-half year lack of contact. The court found that appellant had failed to send gifts or cards to J.C. on holidays and birthdays, that she had moved in September 1987 and refused to tell DFS her new address, that she had then failed to contact DFS for eighteen months, and that she had failed to comply with court-ordered treatment plans. These findings supported the court's determination that appellant had "failed to demonstrate a reasonable and normal concern" for J.C.'s welfare and, therefore, had abandoned J.C. The court also found that there was no significant bonding between appellant and J.C., that J.C.'s behavior deteriorated upon visits with his mother, and *1135 that this represented a "breakdown of the child-parent relationship." Finally, the court found that J.C.'s foster parents were capable of properly caring for J.C. and that they wished to adopt him. The court therefore concluded that appellant had abandoned J.C.; doing so, the court terminated appellant's parental rights.

ISSUES
Appellant raises two points on appeal: (1) the trial court improperly relied on hearsay evidence in concluding that appellant had abandoned J.C.; and (2) absent the improper hearsay, insufficient evidence remained to support the conclusion of abandonment.

ANALYSIS
Our analysis begins with the identification of the elements necessary to establish abandonment. These elements must be proven by clear and convincing evidence. Santosky v. Kramer, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re J. Children, 664 P.2d 1158, 1159 (Utah 1983); Rule 21, Utah Juvenile Court Rules of Practice & Procedure. The statutory abandonment provision for the termination of parental rights reads as follows:
(1) The court may decree a termination of all parental rights with respect to one or both parents if the court finds either (a), (b), (c), or (d) as follows:
....
(b) that the parent or parents have abandoned the child. It is prima facie evidence of abandonment that the parent or parents, although having legal custody of the child, have surrendered physical custody of the child, and for a period of six months following the surrender have not manifested to the child or to the person having the physical custody of the child a firm intention to resume physical custody or to make arrangements for the care of the child;
. . . .
Utah Code Ann. § 78-3a-48 (1987).
In State in re Summers Children v. Wulffenstein, 560 P.2d 331 (Utah 1977), our supreme court adopted the approach of Alaska's courts in defining Utah's abandonment statute, holding that "abandonment consists of conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship." Id. at 334 (quoting In re D.M. v. State, 515 P.2d 1234, 1237 (Alaska 1973)). Since then, Utah appellate review of parental rights terminations based on abandonment has consistently applied the Wulffenstein criteria. See, e.g., J.C.O. v. Anderson, 734 P.2d 458, 462 (Utah 1987); J. Children, 664 P.2d 1158; State in re M.W.H. v. Aguilar, 794 P.2d 27 (Utah Ct.App.1990); State in re T.E. and B.E. v. S.E., 761 P.2d 956 (Utah Ct.App. 1988); State in Interest of J.R.T. v. Timperly, 750 P.2d 1234, 1238 (Utah Ct.App. 1988).
Evidence to prove abandonment must be admissible under basic rules of evidence. In re S.J., H.J., and S.J., 576 P.2d 1280, 1283 (Utah 1978); see also Rule 20, Utah Juvenile Court Rules of Practice & Procedure (only "competent, material, and relevant" testimony admissible in juvenile adjudicatory hearings); Utah Code Ann. § 78-3a-35(5) (1987) (juvenile court may receive "written reports and other material relating to the child's mental, physical, and social history and condition," but may require that the person who prepared the report appear as a witness if reasonably available).[4]

Hearsay and Business Records Exception.
Appellant argues that Ms. Haderlie's testimony as to the contents of the DFS file prepared by others was improperly admitted under Utah R.Evid. 803(6). She also argues that due process rights are violated when hearsay material such as the DFS file or the file summary is used as evidence to support the termination of parental *1136 rights. The evidence objected to by appellant is that which predated Ms. Haderlie's assignment and thus was not based on her personal knowledge. We, however, conclude that any error in admitting this evidence was harmless because there was ample competent evidence supporting the trial court's conclusion of abandonment and see no "reasonable likelihood that the error affected the outcome of the proceedings." State v. Verde, 770 P.2d 116, 121, (Utah 1989). See also Gaw v. State Dep't of Transp., 798 P.2d 1130, 1134 (Utah Ct.App. 1990). The following analysis of appellant's sufficiency of the evidence argument fully supports our conclusion that any error in admitting the hearsay evidence was harmless. Our conclusion of harmless error is further buttressed by the fact that appellant withdrew any objection to the summary of the file after one portion was eliminated.

Sufficiency of the Evidence.
Appellant argues that, absent the impermissible hearsay testimony, insufficient evidence remains to support the termination of her parental rights. We review judge-made factual findings under the "clearly erroneous" standard of Utah R.Civ.P. 52(a), deferring to the trial judge's assessment of witness credibility. We reverse on this ground only if, upon viewing the evidence in the light most favorable to the trial court's findings, those findings run against the clear weight of the evidence, or we are otherwise definitely convinced that a mistake has been made. State v. Goodman, 763 P.2d 786, 786-87 (Utah 1988); In re T.R.F. v. Felan, 760 P.2d 906, 909 (Utah Ct.App.1988). Applying this standard, and excluding all possibly impermissible hearsay testimony, we assess whether abandonment was sufficiently proven.
The elements of abandonment relating to appellant's conduct were supported by that portion of Ms. Haderlie's testimony relating to her own experience as J.C.'s caseworker at DFS. During that period of approximately two years, appellant had no contact with J.C., either directly or by means of gifts, cards, or letters. In that time she asked to see J.C. only once, when she acquiesced to a reasonable request to defer visitation.[5] That single request punctuated nearly two years of silence. Appellant's silence toward both her child and his DFS custodians were evidence of a conscious disregard of her parental obligations under Wulffenstein. See Timperly, 750 P.2d at 1236-37 (parent's failure to contact child for one year, with only one DFS contact, initiated by DFS, sufficient to show abandonment); J. Children, 664 P.2d at 1159-60 (abandonment supported where mother visited children only five times in three and one-half years and sent no gifts or correspondence to them).
Appellant's own testimony failed to refute the evidence presented by the State. As noted, under Utah R.Civ.P. 52(a), it was within the juvenile court's prerogative to disbelieve appellant's claim that DFS had improperly denied her access to J.C., as well as her claim that she had called DFS seeking visitation "lots of times." Additionally, her claim that she had learned "quite a bit" of sign language, coupled with her inability to demonstrate that skill, belied any firm intention to assume J.C.'s care. At best, appellant's testimony indicated only "wishful thoughts and hopes." Wulffenstein, 560 P.2d at 335. See also Aguilar, 794 P.2d at 29; Anderson, 734 P.2d at 462; and J. Children, 664 P.2d at 1159-60 (uncorroborated expressions of intent to resume care and uncorroborated claims of attempts to contact child do not rebut objective evidence of abandonment). Compare T.E. and B.E., 761 P.2d at 958-59 (undisputed plan to visit children, discussions with friends about efforts to see children, and payment of past due child support rebut presumption of abandonment despite eight months without parent-child contact).
The DFS summary, of course, buttressed the finding of abandonment based on appellant's conduct, by showing several addition *1137 years of inadequate parent-child contact, outright refusal of appellant to see J.C. on occasion, noncompliance with treatment plans designed to reunite appellant with J.C., and a refusal by appellant to tell DFS her whereabouts. Even without the file or summary, however, there was no clear error in finding that the conduct-related elements of abandonment were satisfied by clear and convincing evidence.
We must finally consider whether the evidence was sufficient to support the trial court's finding that the parent-child relationship between appellant and J.C. had been destroyed. Here, Ms. Haderlie's testimony based on her personal knowledge is somewhat less persuasive, given her admission that she had never observed J.C. and appellant together. She was, however, able to view the parent-child relationship from J.C.'s perspective through her observations of J.C., noting the absence of mother-son communication for nearly two years to be unusual even for similarly separated parents and children, and further noting J.C.'s progress with his foster parents. The April 1989 phone call from appellant to Ms. Haderlie also supports a finding that the relationship between appellant and J.C. was virtually non-existent: appellant did not call on her own volition, but required external prompting from her own mother to make the call.
Again, looking only at testimony derived from Ms. Haderlie's personal knowledge, we cannot say that the trial court clearly erred in finding that the parent-child relationship between J.C. and appellant had been destroyed.

CONCLUSION
We find that there was sufficient competent evidence to support the court's finding of abandonment and lack of parent-child relationship. The juvenile court's termination of appellant's parental rights is, therefore, affirmed.
BENCH and ORME, JJ., concur.
NOTES
[1] J.C.'s father voluntarily relinquished his parental rights before the proceeding in question here.
[2] According to Ms. Haderlie, J.C.'s behavior problems include bedwetting, flinching, and aggressiveness.
[3] Appellant could not say "J.C., are you sick?," "J.C., are you hungry?," or "J.C., do not do that, it will hurt you" in sign language.
[4] This latter provision was not cited in any of the briefs submitted in this appeal.
[5] The request, made in April 1989, occurred nine months before the termination hearing, at which time Ms. Haderlie had been J.C.'s caseworker for nearly two years. Therefore, it appears that for nearly fifteen months prior to the visitation request appellant had made no effort to contact J.C.